**Erica M. BLACK et al., Plaintiffs,**

v.

**STATE OF MISSOURI et al.,
Defendants.**

**No. 77–0420–CV–W–1–3.**

United States District Court,
W. D. Missouri, W. D.

June 19, 1980.

See also, 460 F.Supp. 421, 592 F.2d 493.

Arthur A. Benson, II, Kansas City, Mo., for plaintiffs.

James R. Borthwick, Shirley Ward Keeler, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., Robert E. Manley, Cincinnati, Ohio, Taylor Fields, North, Colbert & Fields, Kansas City, Mo., for K.C. School Dist.

Lawrence R. Brown, George E. Feldmiller, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for defendant Missouri School Districts.

Barbara Allen Babcock, Barbara B. O'Malley, Brook Hedge, Attys., Dept. of Justice, Washington, D. C., Ronald S. Reed, Jr., U. S. Atty., Kansas City, Mo., for federal defendants.

John D. Ashcroft, Atty. Gen., Sheila K. Hyatt, Asst. Atty. Gen., Jefferson City, Mo., for Missouri State defendants.

## MEMORANDUM AND ORDER

RUSSELL G. CLARK, District Judge.

In a prior memorandum order in this case this Court observed that "[t]his school desegregation action is truly a case of first impression." *School District of Kansas City v. Missouri*, 460 F.Supp. 421, 426 (W.D.Mo. 1978), *appeal dismissed*, 592 F.2d 493 (8th Cir. 1979) (footnote omitted). That observation was prompted by the posture of the parties at the inception of this action—a school district, accompanied by several school children, bringing suit against other school districts and various state and federal agencies, for the purpose of litigating the right of school children within its borders to a public education free from discriminatory segregation and the effects of past segregation, as well as its own claims against the various defendants. The Court then determined that the Kansas City Missouri School District ("KCMSD" or the "District") could not be a fully effective advocate of the school children's interests because proceedings in this action might eventually reveal that the District itself is one of the parties responsible for the alleged segregative condition within its boundaries. *Id.* at 437–42. Consequently, the Court realigned the KCMSD as a party-defendant, and in conjunction with that action directed that "separate legal representation must be obtained by the plaintiff-students who are now represented by the legal counsel for the KCMSD." *Id.* at 442.

That realignment order has given rise to additional unique issues presented in motions for the disqualification of Arthur A. Benson II, present counsel for the plaintiff school children; the law firm of Blackwell, Sanders, Matheny & Weary (Blackwell-Sanders) and in particular, its members James Borthwick and Shirley Keeler, counsel for the KCMSD throughout the course of this action and former counsel for the school children who were party plaintiffs to this action at the time of the realignment; and Taylor Fields of the law firm of North, Colbert & Fields ("North") and Robert E. Manley, co-counsel to the Blackwell-Sand-

ers firm. Those motions have been filed by the Missouri school districts (other than the KCMSD), which are defendants in this action (the "district defendants" or the "defendants"); and it appears the theory of the motions is, at least in part, that there has not been compliance with the Court's directive for "separate legal representation". All parties affected by the motions—the plaintiff school children, the KCMSD and the district defendants—have agreed to submit the disqualification questions to the Court on a designated factual record consisting of several stipulations of fact and various numbered exhibits, comprised primarily of past pleadings and correspondence in this action.[1] The factual summary which follows is based on that disignated record, and where appropriate the Court will make reference to particular exhibits to substantiate pertinent facts.

## I. FACTUAL BACKGROUND

### A. Chronology of Events

As the Court has already noted, this action was initiated by the KCMSD as a plaintiff, along with Gregory Scaggs, Helen Elizabeth Scaggs, Keith Jerome Scaggs, Margaret Stark and Catherine Stark, children attending school in the KCMSD. From the point at which the complaint was filed (May 27, 1977) up to the Court's realignment of the KCMSD (October 6, 1978), Blackwell-Sanders, assisted by Taylor Fields of the North firm, Robert E. Manley, an Ohio attorney, and Dr. Robert S. Freilich, a professor of law at the University of Missouri-Kansas City (UMKC) Law School, represented both the KCMSD and the school children in this action. In this connection, it is noteworthy that Blackwell-Sanders has served as retained counsel to the KCMSD for more than sixty years (Exhibit (Ex) 5). As noted earlier, the Court's realignment order directed the plaintiff school children to obtain legal representation separate from the KCMSD's representation. It also provided that the parent next friends of the students, all of whom were officers of the KCMSD, could not continue to act as next friends so long as they were affiliated with the KCMSD; the solution suggested was the substitution of other persons as next friends. See 460 F.Supp. at 442; 592 F.2d at 495. Subsequent to the Court's issuance of its realignment order, the KCMSD, the plaintiff school children, and various defendants attempted to take interlocutory appeals from the order; the Eighth Circuit refused to hear the appeals under either 28 U.S.C. § 1292(b) or 28 U.S.C. § 1291 and issued its final decision rejecting any appeals from this Court's order on February 16, 1979. See School District of Kansas City v. Missouri, 592 F.2d 493 (8th Cir. 1979).

At that point in time the KCMSD and the plaintiff-students began to take steps to comply with the Court's requirements of separate legal representation and substitution of next friends for the plaintiff-students.[2] In late February, one of the parent

---

1. Subsequent to the filing of the joint designation of facts and evidentiary record, plaintiffs and the KCMSD moved for leave of Court to file the affidavits of James Borthwick, a member of the Blackwell-Sanders firm, Arthur A. Benson II and Robert S. Freilich. Those motions are hereby denied, and the affidavits have received no consideration by the Court. In the joint designation, the parties agreed that "no further evidence will be submitted by any party except by leave of court and upon such conditions as the court may require." The Court declines to grant leave because the affidavits are largely addressed to inferences drawn by the district defendants in their brief in support of disqualification, and the Court is able to determine, from its own examination of the factual record, which inferences are unwarranted.

In addition, although the parties have not included in the joint designation all of the pleadings, correspondence and other documents which have been filed with the Court and made part of the record over the duration of this action, the Court believes that it is free to make reference to any item which is part of the record, if the same is relevant to the matters at issue herein.

2. In an order issued on December 1, 1978, the Court provided that the plaintiffs should accomplish the substitution of next friends or the disaffiliation from the KCMSD of their present parent next friends within "thirty days from any appellate decision disposing of the issues from which an appeal was sought." (EX 5).

next friends of the plaintiff-students contacted Arthur A. Benson II and requested Benson to act as new counsel for the plaintiff-students in all future proceedings in this suit. (*See* Ex. 43 at 3; Plaintiffs' Brief in Response to the Supplemental Brief of the Missouri School District Defendants on the Issue of Disqualification, at 2 (filed Feb. 7, 1980) [hereinafter "Plaintiffs' Brief of Feb. 7, 1980"]). Benson later had several meetings with the plaintiff-students, their current next friends (parents), and proposed plaintiff-intervenor school children and their proposed parent next friends the result of which was his (Benson's) agreement to act as counsel for the plaintiff-students and the proposed student-intervenors. (*See id.* Ex. 95, at 1–3).[3] On March 15, 1979, Benson made his formal entry of appearance as plaintiffs' counsel (Ex. 7), and also entered the application of Dorothy Hodge Johnson to be appointed as next friend for Margaret Stark and Catherine Stark, two of the plaintiff-students in substitution for their mother Joyce Stark. The application was granted and Ms. Johnson was formally appointed as the next friend of the Stark children on April 10, 1979. (Ex. 14). In the interim, on March 30, 1979, the remaining plaintiff-students, Gregory, Helen and Keith Scaggs, moved for dismissal from this action on the ground that they no longer resided in the Kansas City area; Joyce Stark moved for an order discharging her as next friend of the Stark children; and Blackwell-Sanders and its co-counsel entered their formal notice of withdrawal as attorneys for the plaintiff-students. (Ex. 10–12). On April 19, 1979 the Court entered an order dismissing the Scaggs children, granting Blackwell-Sanders and its co-counsel leave to withdraw as attorneys for plaintiff, and *implicitly* granting Joyce Stark's motion to withdraw as next friend of her children. (Ex. 15).[4]

Subsequently, on May 10, 1979, Benson attempted to reactivate proceedings on the merits by seeking leave to file an amended complaint and to serve upon various defendants (not including the KCMSD) interrogatories exceeding a limitation established by a local rule of this district. (Ex. 16–21). Benson also filed on that date, on behalf of thirty school children, a motion for leave to intervene as plaintiffs. On May 18, 1979, the Court granted the motion for leave to file the first amended complaint, but deferred decision on the other motions to a conference scheduled for May 31, 1979. (Ex. 22). At that conference, Benson appeared for the plaintiffs, accompanied by Professor Freilich, who had been lending some assistance to Benson in previous months (Freilich's assistance is discussed more fully *infra*). Benson announced Freilich's intention to enter a formal appearance as co-counsel for the plaintiff Stark children. (Joint Designation Part VI ¶ 1).

Various decisions at that conference affected the course of future proceedings. The Court indicated concern over Freilich's proposed representation of plaintiffs suing, among other defendants, the State of Missouri, because of his employment with the UMKC Law School, an entity affiliated with the state. (Ex. 60). Freilich reported that he had already made a request to the Advisory Committee [the "Committee" or "Advisory Committee"] of the Missouri Bar for an opinion on this issue, and had received a favorable informal opinion from the Committee's chairman. (Ex. 58–59). He also advised the Court that a second "conflict" issue might be inherent in his proposed representation by virtue of the prior representation of the parties before the Court's realignment order. (Ex. 64).

---

**3.** These meetings are also reflected in the depositions of three of the proposed next friends of the proposed student intervenors, Luther Marlyn Johnson, Glenda Sue Folson and Charles D. Black, which were filed with the Court on October 2, 1979.

**4.** While the order did not expressly grant Mrs. Stark's requested withdrawal, the Court. had noted her motion in the opening paragraph of the order and merely failed, by oversight, to state its approval of her request. That approval, however, was made obvious by the Court's appointment of Mrs. Hodges as the next friend of the Stark children on April 10, 1979; and thus further expression of approval, while helpful, was unnecessary.

The Court then expressed its desire to await an official ruling of the Committee on the employment-conflict issue; invited from the parties proposals on discovery proceedings; and stated that the stay on discovery, ordered in conjunction with the appeal of the Court's realignment order, would be continued and that the motion to intervene would be deferred until such time as another intervention motion was filed by fewer proposed intervenors.

During the period in which the parties were filing proposed discovery schedules in response to the Court's directive at the May 31 conference (Ex. 23–25 & 27), the district defendants requested the Advisory Committee to render an opinion on the propriety of Freilich's proposed representation and Benson's ongoing representation of the plaintiffs in view of Freilich's prior service for the KCMSD during the "joint-plaintiffs" stage of this suit and other incidental factors. (Ex. 61). That request generated an exchange of correspondence between counsel for the KCMSD, plaintiffs, and the district defendants *and* the Committee. (Ex. 62–77). Other than the filing of motions to dismiss the amended complaint by all the defendants (Ex. 26, 28–31 & 37–38), except the KCMSD [which filed an answer to the amended complaint on July 3, 1979] and the plaintiffs' response to those motions, the disqualification "debate" remained the center of activity in this case throughout the summer. One additional action was the filing by nine school children, through their attorney Benson, of a new motion to intervene as plaintiffs in this action. (Ex. 36). That motion was later granted by the Court on November 27, 1979. (Ex. 47, at 18–20). During that "debate", on July 18, 1979, Professor Freilich filed a motion for leave of court to enter his appearance as counsel for plaintiffs (Ex. 33); that motion was, not too surprisingly, opposed by the district defendants who obtained a postponement of a ruling on the motion until the issuance of an opinion by the Advisory Committee. (Ex. 34).

On August 6, 1979, the Committee issued its opinion, which found that both Freilich and Benson would stand in a position of conflict if they represented the plaintiffs, as a result of Freilich's prior association with the KCMSD. (Ex. 76). Subsequently, Freilich apparently determined that the plaintiffs' interests would be better served by his withdrawal than by resistance to the disqualification attack of the district defendants, and on August 16, 1979 he filed a notice of withdrawal of his prior motion for leave to enter the case as plaintiffs' counsel. Benson, however, chose to remain in the action, and consequently, the district defendants filed a motion to disqualify him on August 23, 1979. (Ex. 40). Since then, disputes over discovery on the issues raised by that disqualification motion and the earlier intervention motion, the discovery proceedings themselves, and the exchange of briefs on various legal issues, have preempted any further progress on the merits and have commanded considerable attention from this Court. (*See generally* Ex. 47).

During this "second round of debate" (i. e. the presentation of the disqualification issues to this Court following an earlier presentation of the same to the Advisory Committee), several significant actions occurred. On November 27, 1979, the Court permitted nine school children to intervene as plaintiffs in this action, pursuant to Fed. R.Civ.P. 24(b), on the basis that all of the intervenors have standing to raise the claims set forth in the amended complaint and that additional plaintiff-students would "assure the continuance of a live controversy over the longevity of this litigation." Memorandum and Order of November 27, 1979 (Ex. 47), at 24. On December 4, 1979, the district defendants filed their motion to disqualify the Blackwell-Sanders firm on the basis of its prior representation of the Stark children in this action. (Ex. 48). Several days later on December 7, 1979, the Stark children moved for dismissal from this action pursuant to Fed.R.Civ.P. 41(a)(2), stating their desire to remove any possible conflict of interest with which the Blackwell-Sanders firm might be charged by reason of its earlier representation of

them. (Ex. 49). The Court granted that motion and dismissed the Stark children on December 20, 1979, for a reason similar to that stated by the Starks in their motion:

"[T]he requested dismissal may serve to ameliorate any perceptible inconsistency or paradox in the alignment of parties in this case—namely, the prosecution of a desegregation action by school children (Margaret and Catherine Stark) against a school district (the KCMSD) which has among its board members a parent of those children (Joyce C. Stark)."

Order of December 20, 1979 (Ex. 51) at 2.

Consequently, in its present posture, this case is being prosecuted by nine school children who are represented by Benson and who have never been represented by Blackwell-Sanders, its co-counsel, or Professor Freilich. (Ex. 56). In connection with this, it should be noted that Benson has never represented the KCMSD. (See Ex. 42 & 52–54).[5] While the foregoing recital of events represents a fairly complete chronology of the significant actions in this suit from the date of the Court's realignment order in October, 1978 to the present, Freilich's association with the KCMSD during what may be termed the "first chapter" of this action (the stage in which the KCMSD was a plaintiff), and his assistance to Benson in the spring of 1979 merit further discussion.

### B. Freilich's Representation of the KCMSD

Sometime in the summer of 1975, Professor Freilich and Dr. Daniel U. Levine, a professor of education at UMKC, were retained by the KCMSD as consultants, and they began researching the prospects for a lawsuit by the KCMSD against contiguous and suburban school districts and state and federal agencies, for the purpose of creating a "metropolitan" school district. (Joint Designation, Part VI § 3; Ex. 75). That "research" consisted of a review of numerous *public* records and documents of the KCMSD and, presumably, of other school districts, and legal research and the formulation of legal theories. (Ex. 61, Appendices C, E & G; Ex. 69). Although Freilich never became an attorney of record for the KCMSD, he worked in consultation with the District's counsel, the Blackwell-Sanders firm, and his background work culminated in the initial complaint filed in this action by the KCMSD in the spring of 1977. (Ex. 75). Consequently, Freilich was credited by the local press as "one of the main architects" of this lawsuit. (Ex. 61, Appendix D).

During the period of time in which he acted as consultant for the KCMSD, Freilich appeared as a witness for the District in an administrative hearing conducted by the Department of Health, Education and Welfare (*In the Matter of Kansas City, Missouri School District, Kansas City, Missouri*, Docket No. S–92) on the existence *vel non* of segregative practices within the KCMSD. (Ex. 61, at 3 & Appendix G). His testimony was related to the racial composition of the KCMSD and future projections of the same, efforts by the KCMSD to achieve integration within its boundaries, and causes for the disproportionate percentage of minorities within the KCMSD. (Ex. 61, Appendix G). Freilich was compensated for his efforts and time expended at the hearing by the KCMSD. (Ex. 135, at 1). In carrying out his consultation work, Freilich in his own words, "had numerous meetings with the School District Board and their counsel [the Blackwell-Sanders firm] to discuss legal theories and possible remedies." (Ex. 69, at 1). While many of those meetings were "public" or "open" meetings, four were "executive session" meetings,

---

5. The district defendants have noted that Benson employed Ms. Terry Watt as a law clerk from 1974 through July, 1976, and that during that period Ms. Watt was an active member of the "Community Desegregation Task Force", an organization which was sponsored by the KCMSD. (See Joint Designation, Part VII, ¶ 8; Ex. 104 & 106–08). The Court finds no unethi- cal "taint" in this indirect chain of associations between Benson and the KCMSD; the Task Force ceased functioning prior to the commencement of this action (Joint Designation, Part VI ¶ 7), and Ms. Watt's affiliation with Benson was terminated long before his entry into this action.

which were closed to the public. Two of those closed meetings occurred prior to the institution of this action, while two occurred subsequent to that date, with the last session being held on or about February 9, 1979. At those executive sessions, "this lawsuit was discussed in a variety of ways." (Joint Designation, Part VI, ¶ 5).

Although the record does not contain explicit evidence on the question of Freilich's access to confidential documents or information of the KCMSD [primarily as a result of this Court's discovery rulings, see Order of November 27, 1979 (Ex. 47), at 3–14], it seems unlikely that he ever came in contact with or had access to such matters. For his part, Freilich has disclaimed ever receiving any confidential information at school board meetings, and has stated that he "never interviewed any school district officials, nor . . . investigate[d] any facts or evidence related to their conduct or behavior." (Ex. 69, at 2). And Freilich's representations to that effect are credible since, unlike an attorney's representation of a corporate client in a commercial action or of a *defendant* in almost any action, the services Freilich performed—the preparation of a "plaintiff's" desegregation action—would not require examination of the plaintiff-client's confidences, but rather, an investigation into and a review of the defendants' alleged actions and motives or intent regarding the same. (*See* Ex. 122, at 5; Ex. 123).

Subsequent to this Court's issuance of its realignment order in October, 1978, Freilich's consultation role consisted of reviewing the Court's order, exploring legal grounds for appeal, and participating in discussions regarding a possible proposal of settlement by the KCMSD [which apparently never went any further than that theoretical level]. (Ex. 120–21; Ex. 122, at 2; Ex. 123–124; Ex. 127, at 3; Ex. 128 & 132). The last date on which Freilich performed any consultative or legal services for the KCMSD was February 21, 1979, the date on which he participated in a conference with Dr. Henry Hamann, then secretary of the KCMSD board, and Taylor Fields, co-counsel to the Blackwell-Sanders firm. (Ex. 128

& 132). Freilich, however, did not submit his "final invoice" to the KCMSD board until May 3, 1979 (Ex. 132), and the board approved that invoice on June 7, 1979, which apparently was the date of the next scheduled board meeting. (Ex. 134). The record reflects that Freilich participated in a telephone conference with Taylor Fields and Robert Manley on April 4, 1979, which apparently concerned the previously mentioned draft proposal of settlement. (Ex. 133). Freilich's participation no doubt was in the nature of an opinion or recollection from his prior service for the KCMSD in response to an inquiry by Fields or Manley, since Freilich did not bill the KCMSD for the time he expended in that phone conference even though his final invoice was not submitted until May 3, 1979, nearly a month later. (Ex. 132). Consequently, the Court does not believe that the April 4 phone conference was indicative of, or constitutes, services rendered to the KCMSD by Freilich beyond February 21, 1979. Contrary to the interpretation of events advanced by the district defendants, the Court thinks it is clear that Freilich's term of representation of the KCMSD did not extend beyond the February 21 date (on which he last performed any services for the District) to the May 3 date on which he submitted his final invoice to the District.

### C. Freilich's Association With Benson

As the Court noted earlier in this discussion, Benson was brought into this litigation through the solicitation of former next friends in this action, sometime in late February, 1979. After agreeing to represent the plaintiff-students Benson made several phone calls to Blackwell-Sanders attorney James Borthwick for the purpose of securing copies of the original complaint, the Court's realignment order, and other relevant pleadings, and to discuss an informal exchange of discovery materials. (Ex. 54; Ex. 95, at 1–2; Ex. 129, at 2–3). On March 12, 1979, several days prior to his formal entry of appearance and the filing of an application by Dorothy Hodge Johnson for appointment as next friend of the Starks,

Benson sent Borthwick a letter which stated:

> "Knowing that your firm has represented my clients in earlier stages of this litigation, I have discussed the potential of a conflict of interest with *the next friend* and it is *our opinion* that there is no such conflict of interest. *We do not intend*, therefore, *to raise the issue.*
>
> We expect to pursue this litigation vigorously."

Ex. 96 (emphasis added). While it is not absolutely clear to whom the above highlighted mention of "next friend" refers, Benson most likely was referring to Mrs. Johnson (the new next friend), rather than Joyce Stark (the "outgoing" parent next friend of the Stark children). The letter was written just days before Benson filed Mrs. Johnson's application for formal appointment as next friend; and the terms Benson used to relate the next friend's decision to waive any perceptible conflict posed by the Blackwell-Sanders firm's continuing representation of the KCMSD suggest that the next friend who was making that decision would continue to be in the lawsuit in all future proceedings: "We *do not intend* . . . to raise the issue." [6] Mrs. Johnson was not formally appointed next friend of the Starks until April 10, 1979. (Ex. 14).

Benson's first contact with Freilich occurred sometime in late March, 1979 when the two happened to meet at an intermission during a performance of the Kansas City Philharmonic Orchestra. Freilich commented to Benson that he had a long-standing interest in the desegregation theories which had been advanced by the plaintiffs in this action; that he interpreted the Court's realignment order to grant counsel representing the original plaintiffs the option to re-associate with *either* the realigned defendant KCMSD or the plaintiff school children; and that he would like to assist the plaintiffs if Benson thought his (Freilich's) assistance would be of any value, and if the KCMSD raised no objection

to his assistance of the plaintiffs. (Ex. 54; Ex. 69, at 3). Benson apparently was interested in Freilich's offer of assistance, since he telephoned Freilich on March 26, 1979 (Ex. 95, at 5) and dispatched a "speed letter" to Freilich on March 29, 1979 inviting him to a luncheon meeting with Mrs. Johnson, Jack Morgan (a potential fundraiser), and Benson. (*See* Attachment to Plaintiffs' Brief of February 7, 1980.) Benson made brief phone calls to Freilich and Johnson on April 2, setting the luncheon date for April 3. The three met on that date, along with Jack Morgan, and spent two and one-half hours discussing ways of raising funds. (Ex. 95, at 6).

On April 6, Benson and Freilich met for half an hour, and apparently discussed substantive aspects of the plaintiffs' complaint for the first time. A series of phone calls, meetings and correspondence between the two followed over the next two months, which are documented in Benson's time records: April 11—phone call, less than two hours; April 19—conference (including Dr. Levine and others), two hours; April 25—conference, 3 hours; May 1—correspondence; May 2—correspondence; May 3—phone call, less than two and one-half hours; May 9—phone call, less than four hours; May 21—correspondence; May 23—phone call, two hours. (Ex. 95 at 7–14 & 17; Ex. 97–99). The record reflects that these meetings and the intervening correspondence either related to fundraising efforts which Benson was attempting to arrange, or to Freilich's review of proposed pleadings which Benson had prepared, in particular an amended complaint and sets of interrogatories. (Joint Designation, Part VI ¶ 9; Ex. 54 & 97–98). Benson sought Freilich's review of various pleadings and any suggestions on modifications, because Benson was at that time still engaged in the process of becoming acquainted with the issues and legal theories involved in this case. (Ex. 54). The record reflects, how-

---

6. This conclusion is fortified by the fact that under this Court's order of December 1, 1978, Joyce Stark, and other parent next friends, had to cease occupying the roles of next friends or leave their posts on the KCMSD board on or before March 16, 1979. *See* Note 2 *supra.* Benson was no doubt aware of that fact.

ever, that during this period Benson performed the work of drafting the pleadings and meeting with the plaintiffs and proposed intervenors and next friends; he spent much more time performing those tasks than the relatively limited number of hours which he expended in meeting, conferring and corresponding with Freilich. (Ex. 95 at 7–18). Because Freilich's assistance was that of a "reviewing" consultant and was focused on legal theories, the Court finds no reason to doubt Benson's statement in his affidavit that he never received from Freilich any confidential information, oral or documentary, of the KCMSD. (Ex. 42).

As the Court noted earlier, Freilich appeared with Benson at a pretrial conference before this Court on May 31, 1979, at which discovery and intervention issues were discussed, along with the issue of conflicts of interest. The two also met to discuss the case prior to attending the conference; both meetings totalled approximately five hours. Subsequent to the May 31 court appearance, Benson and Freilich did not confer, meet or correspond on any substantive issues in the case. During the months of June, July and August, 1979, a series of communications occurred between the two, but all of these communications related to Freilich's proposed entry of appearance as counsel for plaintiffs and the district defendants' opposition to the same (i. e., the "disqualification debate" before the Advisory Committee). (Ex. 95, at 19–33; Ex. 101–103). And, as previously noted, Freilich completely withdrew from this case on August 16, 1979.

At no time did Benson ever "employ" Freilich or "associate" with him in any professional partnership or similar business arrangement. And at no time did Benson and Freilich enter into a contractual agreement or understanding concerning this suit and the sharing of legal fees or expenses. They did agree to individually maintain accurate time records for the purpose of submitting the same to the Court in the event that the plaintiffs were successful and the Court were to consider an award of attorneys' fees. (Ex. 54). At no time during the brief period of Freilich's assistance to Benson did the KCMSD object to that assistance, although the nature of Freilich's assistance was known to the District's attorneys and was apparently discussed in phone conversations. (*See* Ex. 95, at 5–18; Ex. 69, at 3). While the record suggests that Blackwell-Sanders may have considered the preparation of a formal letter of consent by the KCMSD to Freilich's assistance to Benson, it appears that no such letter was ever written or sent.[7] (*See* Ex. 69, at 3). The foregoing summary constitutes all the known significant facts, which are pertinent to the disqualification motions.

## II. DISQUALIFICATION: THE ETHICAL INQUIRY

A fundamental responsibility of any trial court is the supervision of the attorneys who appear and practice before it. *See Cohen v. Hurley*, 366 U.S. 117, 123–24, 81 S.Ct. 954, 958–959, 6 L.Ed.2d 156, 162 (1961); *Coffelt v. Shell*, 577 F.2d 30, 32 (8th Cir. 1978); *Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602, 605 (8th Cir. 1977), *cert. denied*, 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978); *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975); *Richardson v. Hamilton Int'l Corp.*, 469 F.2d 1382, 1385 (3d Cir. 1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). "In supervising all of its officers, the Court has a

---

7. The district defendants suggest that the KCMSD may in fact have not consented to Freilich's assistance efforts. They note that Benson, in a May 21, 1979 letter to Freilich, inquired: "Will you be interested in and *have permission* to attend the [May 31, 1979 pretrial] conference?" (Ex. 99) (emphasis added). It is their contention that Benson's mention of "permission" was a reference to Freilich's need to obtain the approval of the KCMSD to appear at the May 31 conference. The Court disa-

grees. Freilich's letter of May 25, 1979 to the Advisory Committee, seeking an opinion on the propriety of his proposed representation of plaintiffs in light of his employment at the UMKC Law School, suggests that Benson's reference to "permission" addressed the need for approval from UMKC, since Freilich stated therein that he had "been advised by counsel for the University to seek the advice of the Missouri State Bar Board" on the "employment-conflict" issue. (Ex. 58, at 1).

responsibility to maintain *public* confidence in the legal profession and, accordingly, may disqualify an attorney not only for actual improper conduct but also for failing to avoid even the appearance of impropriety." *Price v. Admiral Ins. Co.*, 481 F.Supp. 374, 377 (E.D.Pa.1979) (emphasis in original); *see Richardson v. Hamilton Int'l Corp.*, 469 F.2d at 1385–86. Thus, if it appears that a breach of professional ethics has been committed by an officer of the Court, the Court must carefully scrutinize all relevant circumstances; determine if a breach has *in fact* occurred; and select an appropriate remedy, which *might* include disqualification of counsel.

For the lawyer whose practice is largely or exclusively centered in the arena of litigation, there is much significance in one of William Shakespeare's classic observations: "All the world's a stage, and all the men and women merely players; they have their exits and their entrances, and *one man in his time plays many parts.*" W. SHAKESPEARE, AS YOU LIKE IT, ACT II, sc. vii, 1. 138–41 (emphasis added). The advocate-litigator often plays "many parts" because of factors such as "the fluidity of membership in large metropolitan law firms and the pattern of movement by lawyers between various employment positions," *Community Broadcasting of Boston, Inc. v. F.C.C.*, 546 F.2d 1022, 1027 (D.C. Cir. 1976), and the representation by large law firms of large corporations which frequently are opponents in litigation. *See City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F.Supp. 193, 196 (N.D.Ohio 1976), *aff'd*, 573 F.2d 1310 (6th Cir. 1977). Because those "parts" sometimes *appear* or are in fact inconsistent (i. e., an attorney's representation of one client in a suit against one of the attorney's former clients, or one of his other clients, whom he has previously represented in a similar matter), the issue of conflicting representations has been raised and addressed in a growing number of cases.

Indeed, it is now widely recognized that "disqualification motions have become 'common tools of the litigation process, being used . . . for purely strategic purposes.'" *Allegaert v. Perot*, 565 F.2d 246, 251 (2d Cir. 1977) [quoting Van Graafeiland, *Lawyers Conflict of Interest—A Judge's View* (Part II), N.Y.L.J., July 20, 1977, at 1 col. 2]; *see Community Broadcasting of Boston, Inc. v. F.C.C.*, 546 F.2d at 1027; *Woods v. Covington County Bank*, 537 F.2d 804, 813 (5th Cir. 1976); *International Elec. Corp. v. Flanzer*, 527 F.2d 1288, 1289 (2d Cir. 1975). *See generally* Note, *The Second Circuit and Attorney Disqualification—Silver Chrysler Steers in a New Direction*, 44 Fordham L.Rev. 130, 147 (1975). Consequently, such motions must be subjected to "judicial scrutiny to prevent literalism from possibly overcoming substantial justice to the parties." *J. P. Foley & Co., Inc. v. Vanderbilt*, 523 F.2d 1357, 1360 (2d Cir. 1975) (Gurfein, J., concurring). However, the good faith of a party, or its counsel, who files a motion to disqualify should not necessarily be thereby called into question, because "in deciding questions of professional ethics men of good will often differ in their conclusions." *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 227 (2d Cir. 1977).

In considering the district defendants' motions to disqualify, the Court is guided by the principles set forth in the American Bar Association (ABA) Code of Professional Responsibility [the "Code" or "ABA Code"], which has expressly been made applicable to attorneys appearing before this Court by Rule 43.4(B) of the Local Rules of Procedure for the United States District Court for the Western District of Missouri.[8] The district defendants have specifically directed the Court's attention to Canons 4, 5 and 9, and their accompanying ethical considerations and disciplinary rules, which the defendants contend support and require the disqualification of Benson and the Blackwell-Sanders firm and its co-counsel. Canon 4 provides: "A lawyer should preserve

---

8. Rule 43.4(B) adopts as a governing ethical code the code which has been adopted by the Missouri Supreme Court. Since 1971 that court has adopted virtually all of the provisions of the ABA Code. *See* Rule 4, Missouri Rules of Court (1980).

the confidences and secrets of a client." Canon 5 enjoins: "A lawyer should exercise independent professional judgment on behalf of a client." And Canon 9 cautions: "A lawyer should avoid even the appearance of professional impropriety." These salutary commands represent ethical and moral principles that the legal profession has considered fundamental to its integrity over many centuries.

While these venerable guidelines must be given considerable weight, they should not be applied inflexibly or without consideration of "realities of which fair decision would call for judicial notice." *Silver Chrysler Plymouth, Inc. v. Chrysler Motor Corp.*, 518 F.2d 751, 753 (2d Cir. 1975). Those realities include society's interest in the most expedient resolution of matters which affect the public at large, and a client's interest in retaining his chosen counsel. *See Arkansas v. Dean Foods Prod. Co., Inc.*, 605 F.2d 380, 383 (8th Cir. 1979); *Woods v. Covington County Bank*, 537 F.2d at 810; *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F.Supp. at 195. In addition, it is important to note that ethical questions cannot be resolved by a "scientific" application of principles and precedents, because "[n]o code of ethics could establish unalterable rules governing all possible eventualities." *Cannon v. U.S. Acoustics Corp.*, 398 F.Supp. 209, 215 (N.D.Ill.1975), *modified on other grounds*, 532 F.2d 1118 (7th Cir. 1976). Therefore, the unique facts of each case must be tested against not only the canonized principles of the Code, but also the broad backdrop of "[e]thical experience". *Arkansas v. Dean Foods Prod. Co., Inc.*, 605 F.2d at 383.

The factual background of the motions at issue herein demonstrates that this case truly presents unique disqualification issues, for here an alleged conflict of interest arose as a result of this Court's order realigning the original parties to this suit. While there are precedents that offer general guidance, the Court has found no case which is on all fours with this case. Nevertheless, the Court believes that it is clear, as the following discussion demonstrates, that no *actual* conflict of interest, nor detriment

to any client's interests, obtains in the advocacy positions which Benson and the Blackwell-Sanders firm and its co-counsel occupy.

## III. STANDING

Both the KCMSD and the plaintiffs have suggested that the district defendants lack standing to raise the disqualification issues presented in their motions. Concededly, it is true that "[a]s a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification." *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 88 (5th Cir. 1976) (citations omitted); *see e. g., Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d at 608; *E. F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 377 (S.D.Tex.1969); *Murchison v. Kirby*, 201 F.Supp. 122, 123–24 (S.D.N.Y.1961); *Payne v. St. Louis Grain Corp.*, 562 S.W.2d 102, 106 & n. 4 (Mo.App.1977) [citing 7 C.J.S. *Attorney and Client* § 47 at 826 (1963)]. *See generally Sapienza v. New York News, Inc.*, 481 F.Supp. 671, 679 n. 4 (S.D.N.Y. 1979). However, where the interests of the public are so greatly implicated as they are in this case, the Court believes that "third parties" such as the district defendants should be entitled to raise any apparent conflicts of interest which might undermine the validity of proceedings in this case.

The Supreme Court has noted that historically the function of exposing and reviewing the conduct of a legal practitioner was not discharged solely by client or court: " 'If a barrister was suspected of misconduct, the benchers of his inn [fellow barristers] might inquire of his behavior." *Cohen v. Hurley*, 366 U.S. at 124, 81 S.Ct. at 959, 6 L.Ed.2d at 162 [quoting *People ex rel. Karlin v. Culkin*, 248 N.Y. 465, 472, 162 N.E. 487, 490 (1928) (Cardozo, C. J.)]. That early practice has since been translated into an ethical duty with which each member of the Bar is charged: "When an attorney discovers a possible ethical violation concerning a matter before a court, he is not only authorized but is in fact obligated to bring the problem to that court's attention." *In*

*re Gopman*, 531 F.2d 262, 265 (5th Cir. 1976); *see* ABA Code, DR 1–102(A) & 1–103(B); *accord United States v. Clarkson*, 567 F.2d 270, 271–72 n. 1 (4th Cir. 1977); *Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp.*, 563 F.2d 671, 673 (5th Cir. 1977); *Sapienza v. New York News, Inc.*, 481 F.Supp. at 679 & n. 4; *United States v. Turkish*, 470 F.Supp. 903, 909 (S.D.N.Y. 1978); *Messing v. FDI, Inc.*, 439 F.Supp. 776, 780 (D.N.J.1977); *Estates Theatres, Inc. v. Columbia Pictures Indus., Inc.*, 345 F.Supp. 93, 98 (S.D.N.Y.1972). And as the Court previously noted in its Order of November 27, 1979 (Ex. 47), "it appears to be the court's duty in a situation of this kind [where an appearance of impropriety may result] to act *sua sponte* to determine if a breach of professional ethics has occurred or is about to occur." *Id.* at 6 n. 9 [quoting *Universal Athletic Sales Co. v. American Gym. Recreational & Athletic Equip. Corp., Inc.*, 357 F.Supp. 905, 908 (W.D.Pa.1973)]; *accord Richardson v. Hamilton Int'l Corp.*, 469 F.2d at 1385.

■ Therefore, the Court concludes that the district defendants have standing to bring alleged conflicts of interest to this Court's attention. Although the clients who are affected by the alleged conflicts of interest, if such exist, have not objected to the conflicts, that circumstance does not preclude the defendants' motions, but it may evidence a waiver by those parties of any conflicts. *See* Part V–B *infra*. The Court is not unmindful of the misuse to which a disqualification motion may be put. However, as the Court has observed, careful judicial scrutiny of such motions is an effective deterrent against any ill-conceived objectives. It should, of course, be apparent to all members of the Bar that "[l]eveling the charge of impropriety at opposing counsel, which if sustained would require withdrawal, should not be a standard part of counsel's offensive armament to be used routinely or without reasonable and good faith belief in its necessity." *First Wis. Mortg. Trust v. First Wis. Corp.*, 584 F.2d 201, 206 (7th Cir. 1978). Plaintiffs and the KCMSD may rest assured that the Code's ethical precepts will be applied to ensure "protection of . . . lambs, [and] not . . . wolves", should there be any "in the lamb-fold." *Acorn Printing Co. v. Brown*, 385 S.W.2d 812, 819 (Mo.App.1964).

## IV. CANON 5: INDEPENDENT JUDGMENT

As one of the ethical bases for the disqualification of Benson and the Blackwell-Sanders firm and its co-counsel, the district defendants contend that those counsel have violated and are violating Canon 5's directive that a lawyer "should exercise independent professional judgment on behalf of a client." This claim appears to be based on the same theory underlying the Canon 4 attack on counsel—i. e., prior conflicting representation by the challenged counsel or an associate of counsel has compromised and precludes the independent judgment which those counsel should exercise on behalf of their present clients. *See e. g., Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d at 608–09. To the extent that this is the thrust of the Canon 5 claim, this argument is addressed below in the Court's discussion of Canon 4.

■ On the other hand, the defendants' citation of Canon 5 might be construed as a "multiple representation" argument, which is the primary concern of Canon 5, because the district defendants have made repeated references in their suggestions to Freilich's "dual representation" of the *plaintiff* school children and the *defendant* KCMSD. If, since the realignment, Freilich had in fact simultaneously acted as a consultant to the Blackwell-Sanders firm (and thereby as counsel for the *defendant* KCMSD) and a consultant to Benson (and thereby counsel to the *plaintiffs*), such "multiple representation" would violate the spirit of the Ethical Considerations of Canon 5, if not the mandatory command of DR 5–105(B) that a lawyer not simultaneously represent two or more clients whose interests differ when the exercise of his independent judgment on behalf of one client is likely to be or will be adversely affected by his representation of another one of his clients. *See generally*

*Sapienza v. New York News, Inc.,* 481 F.Supp. at 678–80; *Rice v. Baron,* 456 F.Supp. 1361, 1373–76 (S.D.N.Y.1978). However, the Court has found that Freilich ceased his consultation work and activities with the Blackwell-Sanders firm and the KCMSD prior to his consultation activities with and assistance to Benson. Therefore, Freilich did not simultaneously represent clients with conflicting interests, and thus neither Benson nor the KCMSD could have been parties to, or have been tainted by, any such "multiple representation".

Finally, the Court reiterates the finding in its prior order of November 27, 1979 (Ex. 47) that there is no collusive relationship between the plaintiffs or their counsel *and* the KCMSD or its counsel. *See id.* at 20–24. While counsel for those parties have manifested a commendable spirit of cooperation in the exchange of information through the discovery process, and while some passages of those parties' pleadings are highly similar in their focus on inter-district relief, such factors do not demonstrate that Benson and the Blackwell-Sanders firm have exercised anything less than independent judgment on behalf of their clients. And the Court finds that those counsel are not and have not been precluded, by any prior associations or services, from exercising independent judgment and rendering uncompromised service for their present clients in this action.

## V. CANON 4: CLIENT CONFIDENTIALITY

As stated earlier, Canon 4 enjoins the attorney "to preserve the confidences and secrets of a client." The self-evident purpose of this ethical principle, as well as of the evidentiary attorney-client privilege which allows a client to forbid testimonial inquiry into confidential conversations between himself and his attorney, is to encourage unbridled and thorough communication between clients and their attorneys. *See Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39, 51 (1976); ABA Code, Ethical Considerations 4–4 & 4–5; C. McCormick, Handbook of the

Law of Evidence § 87 (2d ed. E. Cleary 1972). As one court has noted, "[t]he client must be secure in his belief that his lawyer will never disclose secrets confided in him". *Doe v. A. Corp.,* 330 F.Supp. 1352, 1354 (S.D.N.Y.1971), aff'd *per curiam, sub nom. Hall v. A. Corp.,* 453 F.2d 1375 (2d Cir. 1972). To assure such security, courts as a general rule will upon the request of a client-party, disqualify counsel in an adversary proceeding when the following three elements are present:

(1) the movant party was previously represented by the attorney whose disqualification he seeks;

(2) the matters embraced within the pending suit are *substantially related* to the matters or the cause of action for which the attorney previously represented the movant party; and

(3) the attorney is representing an adversary of the movant party in the pending suit.

*See General Elec. Co. v. Valeron Corp.,* 608 F.2d 265, 267 (6th Cir. 1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980); *Novo Terapeutisk Laboratorium A/S. v. Baxter Travenol Laboratories, Inc.,* 607 F.2d 186, 190–91 (7th Cir. 1979); *Arkansas v. Dean Foods Prod. Co., Inc.,* 605 F.2d at 383 86; *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d at 235–36; *Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d at 607 08.

Upon proof of those three elements, a *presumption* arises that confidences of the movant-client were disclosed to the attorney in the course of the prior representation, confidences which the attorney might use to the detriment of the movant in the current action. *See Arkansas v. Dean Foods Prod. Co., Inc.,* 605 F.2d at 383; *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265, 268–69 (S.D.N.Y.1953). Thus the client need not prove the actual passage of confidences to the attorney, or even the access of the attorney to such confidences; however, it is not clear whether that presumption may ever be rebutted by the attorney. As a general rule, the presumption is "irrefutable" or "conclu-

sive", *General Elec. Co. v. Valeron Corp.*, 608 F.2d at 267; *Arkansas v. Dean Foods Prods. Co., Inc.*, 605 F.2d at 385; *Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d at 608; *In re Yarn Processing Patent Validity Litigation*, 530 F.2d at 89; but in its recent opinion in *Dean Foods*, the Eighth Circuit declined to rule "whether the presumption may under some circumstances be rebuttable." 605 F.2d at 385. The presumption of access to confidences also extends to the attorney's partners, associates and employees, including law clerks, *see id.; Consolidated Theatres v. Warner Bros. Circuit Management Corp.*, 216 F.2d 920, 926 (2d Cir. 1954); ABA Code, DR 5–105(D); and as *Dean Foods* illustrates, the presumption may extend to co-counsel in some circumstances, but not in others. *See* 605 F.2d at 387–88; *cf. Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d at 235–36. It is clear that "labels" should not be a controlling factor in a disqualification inquiry. *See id.* at 235.

### A. Prior Representation

#### 1. Blackwell-Sanders and Co-counsel

 In the instant case, there is no dispute that the Blackwell-Sanders firm and its co-counsel previously represented the Stark children in the first chapter of this litigation, and that they subsequently represented the KCMSD as a defendant against the Starks, who remained plaintiffs in this action until their dismissal in December of 1979. Not only are the matters of the prior and present representations substantially related, but they are identical, since the two periods of representation merely constitute different stages of this lawsuit. Consequently, the three elements of a disqualifying prior representation *were* present here *while* the Starks were plaintiffs in this action. Since the Starks have been dismissed at their request, Blackwell-Sanders and its co-counsel are no longer proceeding (by way of representation of an adversary) against clients whom they had previously represented in a substantially related matter. The record establishes that neither Blackwell-Sanders or its co-counsel have ever represented any of the current nine plaintiff school children in any earlier proceedings. In the absence of such a prior attorney-client relationship, Canon 4 simply is inapposite. *See Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d at 608.

The district defendants, nevertheless, contend that Blackwell-Sanders and co-counsel must be disqualified, because the current plaintiffs "stand in the same position as their (counsel's) former clients (the Starks)". This argument is wholly without merit. First, it is highly unlikely that the Starks, plaintiff-students in a school desegregation action, or their next friend(s), ever discussed with their attorneys any matter of a "confidential" nature; indeed, it taxes the imagination to conceive of any confidential information related to their cause of action, which such plaintiff-students might have possessed and communicated to their attorneys. Second, while the current plaintiffs pursue claims identical to those which the Starks pursued, the Court fails to see how they, by their intervention, can "succeed" to a position of conflict with attorneys who have never represented them. There has been no showing that any conceivable confidential information, which the Starks might have possessed and transmitted to Blackwell-Sanders and co-counsel, was obtained by the Starks from the current plaintiffs. [I. e., Blackwell-Sanders and co-counsel have never been in a position affording access to confidences of the *present* plaintiffs.]

The district defendants argue further that the Starks' dismissal, which by the Starks' own admission (in their motion) was sought to remove any conflict in which Blackwell-Sanders and co-counsel stood, cannot cure the "conflict" because the public will continue to perceive an appearance of impropriety in the current advocacy positions of those attorneys. However, the Court noted in its order dismissing the Starks that the dismissal would serve to improve the public's evaluation of this action, because no longer would there be any relationship between any of the plaintiff-students and the KCMSD. [The Starks'

mother, Joyce Stark, continued to be a member of the KCMSD board after the realignment, although she withdrew from the position of next friend of her children. It was this familial relationship between the *plaintiff* Stark children and their mother, a director of the *defendant* KCMSD, which the Court saw as a potential basis for public concern over the "litigative independence" of the plaintiffs. *See* Order of December 21, 1979 (Ex. 51), at 2–3.] The Court remains confident in the accuracy of this earlier assessment. The possibility that the Starks' dismissal might be perceived as a calculated measure aggravating an existing appearance of impropriety is unlikely because even if the Starks had remained in this suit, Blackwell-Sanders and its co-counsel would not stand in a conflict with their interests. That conclusion follows from two significant factors discussed below— consent and joint representation—which set this case apart from the typical prior representation case. *See* V–B & C, *supra*.

### 2. Freilich and Benson

The factual summary demonstrates that Freilich acted as an attorney for the KCMSD through his role as a legal consultant in the first chapter of this litigation. Consequently, in a memorandum order entered on November 27, 1979, the Court declared that Freilich could not have represented the plaintiff Stark children, in view of his prior representation of the Starks' adversary. *See* Order of November 27, 1979 (Ex. 47), at 3–6. Upon re-examining the factual record and additional briefs submitted by the parties, the Court believes there are two significant factors—consent and prior representation—which remove this case from the general disqualification analysis which the Court applied in its earlier order. *See* V–B & C, *infra*. Thus, while Freilich would have been subject to disqualification under the general rule, an exception applies here as more fully discussed below.

▮ The district defendants have characterized Freilich's position or role of assistance to Benson as the equivalent of the role

of a member of an attorney's staff or of his firm. And, from this assertion, they have reasoned that Freilich's conflict of interest is imputed to Benson and that Benson therefore must thus be disqualified. Since the Court now concludes that Freilich did not stand in a conflict with the interest of the plaintiffs, Benson quite obviously does not suffer from any imputed conflict of interest. However, even if the Court were to abide by its earlier conclusion that Freilich stood in a conflict with the interests of the KCMSD, his former client, Freilich's conflict would not be imputed to Benson by virtue of Freilich's assistance. Regardless of the label affixed to Freilich's role of assistance, his efforts amounted to no more than that which would have been permissible for "transitional consultation", an exception to the general rule of imputing a conflict to the employees, associates, and co-counsel of disqualified counsel, which is discussed below. *See* V–D, *infra*.

### B. Consent—Waiver

▮ It should be clear from the foregoing discussion that disqualification of counsel is a judicial action which is taken to protect the client. Indeed, as one commentator has noted, "the client is what standards are all about." Patterson, Wanted: *A New Code of Professional Responsibility*, 63 A.B.A.J. 639, 642 (1977). However, a client may perceive no detriment in his former attorney's representation of his current adversary, and thus the "client may consent to the employment of the attorney by [the] adverse party even where the client is involved in the case as a party." *In re Yarn Processing Patent Validity Litigation*, 530 F.2d at 89; *see* 7 Am.Jur.2d *Attorneys at Law* § 156 (1963). This "consent" may also be conceptualized as a "waiver" by the client of his "right to object to an attorney's allegedly adverse representation." *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F.Supp. at 205. As the Fifth Circuit noted in *Yarn Processing*, consent "typically occur[s] where the former client realizes that any prior disclosures will not prejudice him in the new case." 530 F.2d at 89.

Benson, and Blackwell-Sanders and its co-counsel, contend that this is precisely the determination which the Stark children, through their next friend, and the KCMSD reached; and they argue further that the facts reveal that the Stark children and the KCMSD waived any objections to their current advocacy roles.

█ The district defendants counter this argument by contending that no waivers in fact occurred and that, even if the KCMSD and the next friend of the Starks have attempted to waive the alleged conflicts of interest, such waivers are invalid by reason of public policy. The Court will address the second contention below. With regard to the first contention, several points should be noted. To begin, it is axiomatic that "[a] person cannot waive a right of which he is unaware." *E.F. Hutton & Co. v. Brown*, 305 F.Supp. at 400. Thus, "counsel . . [should] call to the attention of . . . [their clients] the existence and implications of any potential conflict of interest." *Id.; accord, Marketti v. Fitzsimmons,* 373 F.Supp. 637, 641 (W.D.Wis.1974) [quoting *E.F. Hutton & Co. v. Brown*, 305 F.Supp. at 398]. The purpose of such disclosure is "to put the client in a position to protect himself by retaining substitute counsel if he so desires." *Id.* There can be little doubt in this case that counsel for the plaintiffs and the KCMSD discussed the possibility of conflicts of interest among themselves and with their clients, *see* Part I–C *supra*; indeed, the clients could hardly escape familiarity with the "existence and implications" of any possible conflicts, since those issues have been the focal point of this action since June, 1979. *See* Part I–A *supra*.

█ A waiver of a conflict of interest or consent to adverse representation might be accomplished through the use of a letter of consent or some similar document, but a documentary manifestation of consent is not necessary. The courts have recognized that consent may be implicit in the client's failure to object to his former attorney's representation of his current opponent. *See Rossworm v. Pittsburgh Corning Corp.*, 468 F.Supp. 168, 175 (N.D.N.Y.1979);

*City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F.Supp. at 205. As the Ninth Circuit has noted "[w]aiver refers to the voluntary or intentional relinquishment of a known right" and "emphasizes the mental attitude of the actor". *Matsuo Yoshida v. Liberty Mutual Ins. Co*, 240 F.2d 824, 829 (9th Cir. 1957). Conduct is often the most reliable manifestation of that mental attitude. Here, although Mrs. Johnson, the next friend of the Stark children, had not yet been formally appointed to that position on the date on which Benson drafted his letter of consent to Blackwell-Sanders (March 15, 1979), she then discussed the issue of a conflict with Benson and determined that no conflict exists. Since, her formal appointment to this date, she has not signaled a contrary belief. Thus to the extent that Benson's consent letter was technically ineffective as the consent of the plaintiffs' next friend, Mrs. Johnson's subsequent conduct is sufficient itself to manifest her consent. Similarly, although Blackwell-Sanders apparently failed to prepare a letter on behalf of the KCMSD to manifest its consent to Freilich's assistance to Benson, the KCMSD has never objected to that assistance, even though it has had every opportunity to do so. No doubt the KCMSD board was aware of Freilich's assistance to Benson when it voted to approve Freilich's last invoice for legal fees at its June 7, 1979 meeting, but the Board expressed no objection to that assistance then, nor has it ever done so. Thus, the Court concludes that the Stark children, through Mrs. Johnson, and the KCMSD manifested their consent through their conduct to the advocacy roles of Freilich and the presently challenged counsel.

### 1. Validity of the KCMSD's Waiver

█ The district defendants claim that the KCMSD's waiver is ineffectual for the reason that a public body cannot waive a conflict of interest. In support of this proposition, they point to the opinion of Harold W. Barrick, chairman of the Advisory Committee (Ex. 59), and cite the cases of *Greene v. Greene*, 47 N.Y.2d 447, 418 N.Y.S.2d 379,

391 N.E.2d 1355 (1979) and *In Re A. & B.*, 44 N.J. 331, 209 A.2d 101 (1965). With all due respect to Mr. Barrick, the Court disagrees. Mr. Barrick cited absolutely no authority in support of his opinion. Turning to the defendants' citations, the *Greene* case did not involve a public body, and the court's statement therein that consent to a conflicting representation is often ineffectual if the public interest is implicated was merely dictum. *See* 418 N.Y.S.2d at 382, 391 N.E.2d at 1358. The *In Re A. & B.* case also does not stand for the broad proposition for which the district defendants cite it. There, the New Jersey Supreme Court addressed the situation of an attorney's dual or simultaneous representation of private clients (land developers) and a governmental body (a municipality). *See* 209 A.2d at 103. The Court believes there is a significant difference between the case of *simultaneous* representation of a public body and a private client who have conflicting interests and this case of *successive* representations of a public body, such as a school district, and private clients, such as students, whose interests have become adverse by reason of a judicial decision. Absent from the latter case, but present in the former case is the very real concern that the public may think the attorney will "trade on his official connections". *State v. Galati*, 64 N.J. 572, 319 A.2d 220, 223 (1974).

Local governmental units such as the KCMSD are "creatures of the State" and their authority is derived from and measured by state law. *Bambu Sales, Inc. v. Gibson*, 474 F.Supp. 1297, 1301 (D.N.J. 1979). Under Missouri law, a school district is "vested with discretion in *all matters affecting* school management," *Saunders v. Reorganized School Dist. No. 2 of Osage City*, 520 S.W.2d 29, 35 (Mo.1975) (emphasis added); *accord Smith v. Consolidated School Dist. No. 2*, 408 S.W.2d 50, 53 (Mo. en banc 1966); and to effectuate various expressly delegated powers concerning education, a district inherently possesses certain implied powers, among which is the capacity to sue and to be sued. *See School District of Kansas City v. Missouri*, 460 F.Supp. at 444. The Court believes that the power to sue also partakes of the authority to make tactical or procedural and substantive decisions with respect to suits commenced by a district. Nowhere in the statutory scheme governing Missouri school districts is there any prohibition, express or implied, against the waiver of a technical conflict of interest in which counsel for an adversary of the district stands. *See* Mo. Ann.Stat. §§ 162.011–171.191 (Vernon's 1965 & 1980 Cum.Supp.). In addition, the Court's research has not uncovered any Missouri or federal cases holding that a school district or any public body lacks the authority to consent to a former attorney's representation of an adversary. On the other hand, the Court notes that it has been held that a city could and did, by its conduct, waive its right to object to a former counsel's representation of its opponent in a lawsuit. *See City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F.Supp. at 203–05. Since the KCMSD's waiver of Freilich's alleged conflict does not violate Missouri's prohibition against an "unreasonable, arbitrary, capricious or unlawful" exercise of power by a school district, *see School District of Kansas City v. Clymer*, 554 S.W.2d 483, 487 (Mo.App.1977), the Court concludes that the waiver was valid.

### 2. Validity of Mrs. Johnson's Waiver on Behalf of the Plaintiff Stark Children

The district defendants contend that Mrs. Johnson had no authority to waive the conflict of Blackwell-Sanders and its co-counsel on behalf of the Starks who are minors. It is well settled that a guardian ad litem or next friend "cannot admit anything or waive anything *which goes to sustain the adverse party's claim*." *M.F.A. Mut. Ins. Co. v. Alexander*, 361 S.W.2d 171, 181 (Mo.App.1962) (emphasis added); *see Dacanay v. Mendoza*, 573 F.2d 1075, 1079 (9th Cir. 1978) (guardian ad litem or next friend may not "prejudice the substantial rights of the minor litigant"); *Dixon v. United States*, 197 F.Supp. 798, 803 (W.D.S. C.1961) (same); *Tracy v. Martin*, 363 Mo. 108, 249 S.W.2d 321, 323 (Mo. en banc 1952) (same). *See generally* 43 C.J.S. *Infants*

§ 236, at 619 (1978). Thus, for example, a minor's representative may not stipulate to a judgment against the minor in the absence of court approval or waive the minor's rights in property which is the object of a lawsuit, *see Campbell v. Campbell,* 350 Mo. 169, 165 S.W.2d 851, 856–57 (1942); and a representative of a minor who is a litigant in a will proceeding cannot "admit a construction [of the will which is] in any way detrimental to his ward . . . , if there is a reasonable construction more favorable." *Kennard v. Wiggins,* 394 Mo. 283, 160 S.W.2d 706, 712 (1941), *cert. denied,* 317 U.S. 652, 63 S.Ct. 47, 87 L.Ed.2d 524 (1942).

 However, the minor's representative may "bind the minor to procedural steps of litigation." *Dacanay v. Mendoza,* 573 F.2d at 1079 n. 8. Among such procedural steps are the selection of a forum, choice of venue, the determination whether or not to waive a jury trial, and the admission or stipulation of undisputed facts. *See Blades v. Spitzer,* 252 N.C. 207, 113 S.E.2d 315, 320 (1960); 43 C.J.S. *Infants* § 236, at 620 & n. 3. Thus, the representative "may make a valid consent or waiver as to matters which *merely facilitate the litigation and cannot prejudicially affect the rights of the infant." Id.* § 241, at 632 (emphasis added); *see Maine Nat'l Bank v. Petrlik,* 283 A.2d 660, 663 (Me.1971); *Stephens v. Stephens,* 311 P.2d 241, 243 (Okl.1957). The Court believes that such "procedural discretion" encompasses the decision to waive a conflict of interest with which an adversary's counsel has been charged if it is reasonably clear to the representative that counsel did not obtain any confidential information in the prior representation which he could use to the minor's detriment in the pending suit. Such a waiver would not prejudice the minor's substantive rights or claims which are at stake in the pending suit, but rather would facilitate a more expeditious resolution of the suit. In this connection it should be noted that the representative not only has "authority to engage counsel, file suit, and to prosecute, control and direct the litigation", but is charged with "full responsibility to assist the court to 'secure a just, *speedy and inex-*

*pensive determination' of the action." Noe v. True,* 507 F.2d 9, 12 (6th Cir. 1974) (emphasis added) [quoting *Fong Sik Leung v. Dulles,* 226 F.2d 74, 82 (9th Cir. 1955) (Boldt, J., concurring)]. Where, as here, disqualification of counsel would delay proceedings and counsel's alleged conflict is technical only, prudence would suggest that the representative waive the conflict in the interest of expediency and efficiency. Furthermore, the waiver at issue herein yielded a benefit to the minor plaintiffs—the Stark children—because the waiver was made by Mrs. Johnson and her attorney Benson with the understanding that the KCMSD would not object to Freilich's assistance to Benson.

The district defendants cite two decisions, one of them a Missouri case, which they contend hold that consent should not be countenanced in a case in which minors are involved. *See In re Pfiffner's Guardianship,* 194 S.W.2d 233, 236 (Mo.App.1946) and *Weinberg v. Underwood,* 101 N.J.Super. 448, 244 A.2d 538, 540–41 (1968). The Court believes that both cases are distinguishable from and not controlling over this case. The *Pfiffner* decision addressed the propriety of awarding an attorney a legal fee out of a minor's interest in an estate when his representation of the minor's guardian, her sister, was at conflict with his *simultaneous* representation of the sister as administratrix of an estate in which both the sister and minor had property interests. *See* 194 S.W.2d at 234–36. The lawyer's continuation in the dual consultation roles might very well have resulted in a detriment to the minor's financial interests in the estate. The minor had *no* guardian ad litem or next friend during the time period in question and there was no real contention that the attorney had secured consent from the minor. Thus the *Pfiffner* case does not hold that a guardian ad litem or next friend can never waive or consent to an attorney's conflict of interest. Nor did the *Weinberg* case announce such a general, sweeping rule. In fact that case did not involve either a minor or a guardian ad litem or next friend, but rather addressed a joint-plaintiffs situation in which the interests of

plaintiff-parents—passengers in an automobile involved in an accident—were potentially adverse to the interests of their plaintiff-daughter—the driver of the automobile, because the defendant—driver of a second automobile—had filed a counterclaim for contribution against the daughter. Both parents and daughter had been represented by one attorney when they commenced the action. In view of the defendant's counterclaim, and the conflict it might produce between the interests of the parents and daughter, the Court held that the attorney could not represent either interest since his representation of the family as a whole compromised his ability to exercise independent judgment as to either "unit". *See* 244 A.2d at 540–41.

■ Finally, it should be noted that whenever minors are involved in an adversary proceeding, "the trial judge ha[s] a special obligation to see that they [are] properly represented," *United States v. Reilly*, 385 F.2d 225, 228 (10th Cir. 1967), and "the court itself assumes ultimate responsibility for determinations made on behalf of the child." *Noe v. True*, 507 F.2d at 12; *accord Dacanay v. Mendoza*, 573 F.2d at 1079; *Dixon v. United States*, 197 F.Supp. at 802. Mrs. Johnson was appointed next friend by this Court pursuant to Fed.R. Civ.P. 17(c), and it is this Court which must review and evaluate her actions. *See generally M.S. v. Wermers*, 557 F.2d 170, 174 n. 4 (8th Cir. 1977). The alleged conflicts of interest in this case have not gone unnoticed by this Court. Rather, the Court has carefully scrutinized counsel's representation and has been solicitous of the rights and interests of the minor plaintiffs, but it has not found and does not now find that Mrs. Johnson's waiver sacrifices or impairs those rights and interests. "[T]he rule against conflicts of interest is not against conflicts as such but against conflicts which disserve the interest of justice . . . ." 43 C.J.S. *Infants* § 232b, at 601. The Court concludes that Mrs. Johnson's waiver is valid, because it was not a waiver of a conflict which "disserves the interest of justice."

### C. Joint Representation

Related to the issue of waiver or consent by each of the clients affected by the alleged conflicts is the fact that the prior representations forming the basis of those alleged conflicts were a single "joint representation" of the KCMSD and the Starks (along with other minor plaintiffs) as joint plaintiffs by Blackwell-Sanders and its co-counsel, along with Freilich. To the extent that there remains any question over the validity or propriety of the waivers discussed above, the Court believes that the challenged counsel clearly do not suffer from a conflict of interest by reason of this circumstance of prior joint representation.

■ During the first chapter of this litigation, to which the Court has repeatedly referred, both the KCMSD and the minor school children were proceeding as plaintiffs who shared a community of interest, manifested in the original complaint filed in this action. Both contended that the disproportionate racial composition of the KCMSD was caused by actions of the various state and federal defendants, and both sought, *inter alia*, interdistrict relief. The Court determined, however, that the possibility existed that the segregative condition of the KCMSD was in part a result of prior or current practices or actions of the KCMSD itself; thus, to assure that the rights of the minor school children would be fully explored and protected, the Court decided that the KCMSD should be realigned as a defendant. *See School District of Kansas City v. Missouri*, 460 F.Supp. at 440–42. Subsequent to realignment, the plaintiff-students filed an amended complaint, which alleges, *inter alia*, that the KCMSD committed *de jure* acts of segregation in the past and that the impact and effect of those acts and alleged acts of the other defendants in the case can only be remedied by dissolution of the geographical unit comprising the KCMSD and the formation of a metropolitan-wide (but geographically limited to the boundaries of the State of Missouri) school district. Although the plaintiff children and the KCMSD have, since realignment, been adversaries, there was no divergence

of interests among them during the period of joint representation, in terms of their litigation strategy at that time.

When two or more parties are jointly represented in a matter as co-defendants or co-plaintiffs by one or more attorneys, and are proceeding on the same claims and legal theories, it is normally understood that any information which is shared with counsel by one party might and probably will be transmitted to the other joint party by counsel. Here, nothing in the record suggests that any one of the original parties-plaintiff— the school children by their next friends or the KCMSD—ever expected that any confidential information which one party communicated to the joint attorneys would not be disclosed to another party-plaintiff; and none of those parties have ever contended that they had such an expectation. Indeed, such an exchange of information is quite likely since the original next friends (who were the parents of the minor plaintiffs then in the suit) were also members of the KCMSD board. *See* Part I–A *supra.* [Although, as the Court has previously observed, it is highly unlikely that any of the plaintiff children communicated any confidential information to any of the attorneys.] Thus, as between the common clients—the KCMSD and the original minor plaintiffs, any communications which they had with Freilich or the Blackwell-Sanders firm and its co-counsel were not confidences or secrets within the contemplation of Canon 4. *See Allegaert v. Perot,* 565 F.2d at 250; *Moritz v. Medical Protective Co. of Fort Wayne, Ind.,* 428 F.Supp. 865, 872–73 (W.D.Wis.1977).

In *Allegaert v. Perot, supra,* the Second Circuit faced a factual situation somewhat similar to the one before this Court. There, several Wall Street brokerage firms which were experiencing financial difficulty entered into a legal association resembling a "joint venture" that was arranged by each firm's legal counsel. During the existence of the "joint venture", the attorneys of each brokerage firm rendered various services on behalf of the "joint venture". Apparently the financial difficulties of one of the firms worsened, and it eventually filed a petition in bankruptcy. Subsequently, the trustee in bankruptcy brought a securities action against the other firm and other defendants, and in that action sought to disqualify two of the law firms which had served as counsel to the "joint venture". The district court refused to disqualify the firms and the court of appeals upheld it on the basis that "[n]either [the prior client, the bankrupt firm] nor anyone connected with it could have thought that . . . any information given to the law firms conceivably would have been held confidential from the [other firm in the joint venture, and its parent concern]." *Allegaert v. Perot,* 565 F.2d at 250.

As a consequence of the joint representation, the Second Circuit concluded that the "substantial relationship" test of Canon 4, under which the law firms might have been disqualified, was inapplicable: "[B]efore the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he *could* have received information which his former client might reasonably have assumed the attorney would withhold from his present client." *Id.* (emphasis in original); *accord Moritz v. Medical Protective Co. of Fort Wayne, Ind.,* 428 F.Supp. at 874–75; *Lau v. Valu-Bilt Homes, Ltd.,* 582 P.2d 195, 202–04 (Haw.1978); *Petty v. Superior Court,* 116 Cal.App.2d 20, 253 P.2d 28, 33–34 (1953); *cf. Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 479 F.Supp. 465, 468–69 (E.D.La.1979). *But cf. Brennan's, Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168, 171–72 (5th Cir. 1979) (where single attorney represented various members of family with respect to family business interests, prior to fission of those interests, *and* where, in suit brought by one family group [as plaintiffs] against another family group [as defendants], *plaintiffs objected* to common attorney's representation of defendants, attorney had to be disqualified under Canon 9). Since the Court finds that none of the "former clients" involved in this case, the original joint plaintiffs, expected that communications with their attorneys would be kept confidential from any of the other joint

plaintiffs, Canon 4 and the substantial relationship test are inapposite. The district defendants suggest that the "joint representation" rationale is not applicable here because minors are involved; but the Court sees no significant distinction in this factor since those minors were and are represented by a next friend who, as previously noted, has the authority to make various procedural decisions concerning the course of this litigation, subject to this Court's approval. *See* Part V–B–2 *supra*.

### D. Transitional Consultation

▮▮▮▮▮ Even if this Court were to abide by its earlier conclusion that Freilich (had he attempted to stay in this action) would have been subject to disqualification under Canons 4 and 9, the Court believes that Benson, nevertheless, *would not* also be subject to disqualification by reason of Freilich's assistance and association with him. The courts have recognized that where an attorney has been disqualified, that attorney's present client in the pending suit will suffer the loss of experienced counsel who generally has expended considerable time and efforts in preparing and litigating the client's case. To soften the harsh impact of such a loss, new or substitute counsel has been permitted access to the work product of disqualified counsel *and* limited consultation with disqualified counsel for the purpose of explanation of such work product. *See First Wis. Mortg. Trust v. First Wis. Corp.*, 584 F.2d at 205–08; *International Business Machines Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978). The Court believes that the factual summary demonstrates that Freilich's assistance to Benson during a brief two month period amounted to no more than limited consultation on prior pleadings and the legal theories underlying such.

The district defendants have noted that Benson had already obtained pleadings and other documents filed in the first chapter of this litigation from the Blackwell-Sanders firm, and thus they question the applicability of the work product-turnover doctrine to Freilich's efforts. However, this suit had been in progress for nearly one and one-half years at the time of this Court's realignment order; and given the complexity of the desegregation issues raised in past pleadings and court orders, there can be no serious dispute that Benson—the plaintiff-students' new counsel—would have labored under a serious disadvantage without some explanation of those issues. Freilich provided that explanation through consultation and assistance efforts which only consisted of approximately twenty hours of time and which spanned a period of two months (April and May, 1979). A similar period of consultation (sixty days) in conjunction with the turnover of disqualified counsel's work product was approved by the Third Circuit in the *Levin* case. *See* 579 F.2d at 283.

The district defendants argue that both *Levin* and *First Wis. Mortg. Trust* are distinguishable on their facts, because in those cases no confidential information had been obtained by the disqualified counsel. Admittedly, *Levin* involved dual representation and the application of Canon 5, and the trial court there had found that disqualified counsel had not obtained any confidential information of its prior client. But the Third Circuit noted, in approving work product turnover and consultation, that "specific injury to the moving party ha[d] not been shown." 579 F.2d at 283. Similarly, the district defendants have failed to show that they have been injured by Freilich's consultation, and they have also failed to show how the KCMSD has been injured. The Court believes the record amply illustrates that Benson never obtained any confidential information of the KCMSD from Freilich, if Freilich ever had any. Nor is this case entirely unlike *First Wis. Mortg. Trust* which involved a prior representation and the application of the Canon 4 "substantial relationship" test, since the documents and information which Freilich examined and to which he had access during his service for the KCMSD, like the files examined by the attorney in that case, were primarily public records available to all parties. *See* 584 F.2d at 207.

The district defendants vigorously assert that Freilich's actions far exceeded the role of work-product consultation, but they provide no factual support for their assertions. The record reveals only a series of consultation sessions in which Freilich and Benson discussed the pleadings; and Freilich's contributions consisted of explanations of past pleadings and review of new pleadings drafted by Benson. The defendants also make much of Freilich's appearance with Benson in the May 31, 1979 pretrial conference before the Court and suggest that it was the crowning event in a course of conduct whereby both attorneys held themselves out to the public as joint counsel for the plaintiff Stark children. However, that conference was the first and only occasion where Freilich actually appeared publicly on behalf of plaintiffs; and Freilich did not brazenly take matters into his own hands by engaging in the active representation of the plaintiffs, but rather he sought this Court's leave and pointed out potential conflicts of interest. Indeed, the Court believes that Freilich's announcements at the conference clearly indicate that his role, up until that point in time, was only that of a limited consultant, and not that of co-counsel, associate or staff member. And, as the Court has found, Freilich rendered no efforts of assistance to Benson after the conference.

Therefore, the Court concludes that, even if Freilich had been subject to disqualification (a conclusion which it now rejects), his association with Benson did not "taint" Benson with a disqualifying conflict. Freilich's role of assistance was a "peripheral one"; and it was Benson who was then and is now "guiding [this] matter", and who was and is "the moving force in this litigation." *Akerly v. Red Barn System, Inc.*, 551 F.2d 539, 544 (3d Cir. 1977). Since the Court views Freilich's assistance to Benson as permissible "transitional consultation", it is unnecessary to consider the "co-counsel" cases cited by the district defendants. However, the foregoing discussion should demonstrate that Freilich and Benson did not associate in the type of close relationship which justified the disqualification of co-counsel in those cases.

## VI. CANON 9: APPEARANCE OF IMPROPRIETY

■ The district defendants contend that, even if challenged counsel have not committed any improper acts, the public is certain to perceive an impropriety in the current advocacy positions which those counsel occupy, in light of the prior period of representation in this suit. In support of this claim, they note that this case has been heavily publicized, including the disqualification proceedings. It is a fundamental ethical precept that every attorney "should avoid even the appearance of impropriety". ABA Code, Canon 9. To say this is not to say that an attorney must be disqualified from representation of a litigant whenever there is a possibility that the public will perceive some impropriety in that representation, however remote that possibility may be. While an attorney may be disqualified under Canon 9 in the absence of an actual breach of ethics, *see International Business Machines Corp. v. Levin*, 579 F.2d at 283, "there must be at least a reasonable possibility that some specifically identifiable impropriety did in fact occur." *Woods v. Covington County Bank*, 537 F.2d at 813; *see Church of Scientology of California v. McLean*, 615 F.2d 691, 693 (5th Cir. 1980); *Board of Educ. of City of New York v. Nyquist*, 590 F.2d 1241, 1247 (2d Cir. 1979); *R–T Leasing Corp. v. Ethyl Corp.*, 484 F.Supp. 950, 954 (S.D.N.Y.1979).

■ The Court's discussion of Canons 4 and 5 illustrates that such a "reasonable possibility" does not exist in this case. When considering the public's view, "we must be careful not to accept the view of the most cynical as the true voice of the public." *International Elec. Corp. v. Flanzer*, 527 F.2d at 1294; rather, "the Court must consider what it believes would be the view of the average layman." *Price v. Admiral Ins. Co.*, 481 F.Supp. at 378. Considering the average layman's perception of this case, the Court believes that such an individual would not be troubled by the current posture of parties and counsel in

this suit. Indeed, if the average layman has followed the local press's coverage of the progress of this action, and particularly this Court's realignment order in the fall of 1978, he most likely would think it logical and reasonable that counsel representing the original plaintiffs parted ways when the Court "parted" the plaintiffs—Blackwell-Sanders and its co-counsel continuing to represent the KCMSD, a client which Blackwell-Sanders has represented for over 60 years, and Professor Freilich attempting to assist the minor plaintiffs who were and always had been the object of the desegregation theories which he formulated in the original complaint.

The concern of Canon 9 is, as the Third Circuit noted in quoting Lord Herschell, that people in addition to getting justice "should be made to feel and see that they [are] getting it." *Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1088 (3d Cir.), *cert. denied, sub nom. Arthur Andersen & Co. v. Kramer*, 429 U.S. 830, 97 S.Ct. 90, 50 L.Ed.2d 94 (1976) [quoting 2 J. B. Atlay, Victorian Chancellors 460 (1908)]. The Court believes that the citizens of this metropolitan area, and particularly the taxpayers whose taxes have been charged with the legal fees of the counsel representing the various school districts in this case and the parents whose children attend school within the geographical area at issue in the complaint, would be more likely to "feel and see" justice in the continuation of the present advocacy roles of the challenged counsel, than in the disqualification of those counsel. Disqualification could only further delay a final determination of the issues in this suit and generate additional expenses for the KCMSD and the plaintiffs, who would need to retain new counsel and compensate them to duplicate preparatory efforts of present counsel. Such considerations are entitled to considerable weight in a disqualification inquiry under Canon 9. *See W. T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir. 1976). And the Court believes that the publicity surrounding this case to date suggests that the public's confidence in the integrity of our judicial system would be eroded and emasculated by the disqualification of challenged counsel, because such an action would likely be viewed as a triumph of regimented rule over reason. As the Eighth Circuit has observed, "[d]isqualification in spasm reaction to every situation *capable of appearing improper to the jaundiced cynic* is as goal-defeating as failure to disqualify in blind disregard of flagrant conflicts of interest." *Arkansas v. Dean Foods Prod. Co., Inc.*, 605 F.2d at 383 (emphasis added). Several of the news articles that have chronicled the progress of the disqualification proceedings reflect a concern over delay and the replacement of counsel in the event of disqualification. Illustrative of that concern are the headlines of two of those articles: "School Suit May Face New Delay" (Ex. 89), and "Lengthy KC School Suit Stalls". (Ex. 90).[9]

In addition to the likely public reaction to the disqualification *vel non* of challenged counsel, this Court must also weigh the client's interest in retained counsel of his choice, an interest which the courts have regarded as significant. *See, e. g., Board of Educ. of City of New York v. Nyquist*, 590 F.2d at 1246; *Woods v. Covington County Bank*, 537 F.2d at 813. Blackwell-Sanders has represented the KCMSD as retained counsel over a period of 60 years and has no doubt developed some expertise in the area of desegregation litigation. Consequently, there can be no dispute that the KCMSD has a great interest in that firm's continu-

---

**9.** In this connection the Court finds significant the Seventh Circuit's observation in *Woods v. Covington County Bank*: "[T]he more frequently a litigant is delayed or otherwise disadvantaged by the unnecessary disqualification of his lawyer under the appearance of impropriety doctrine, the greater the likelihood of public suspicion of both the bar and the judiciary." 537 F.2d at 813. President Jimmy Carter expressed a similar concern in an address he delivered at the one hundredth anniversary of the Los Angeles County Bar Association on May 4, 1978:

"I am worried about a legal system in which expensive talent on both sides produces interminable delay—especially when delay itself can often mean victory on one side.

Justice should not be forced to obey the timetables of those who seek to avoid it."
64 A.B.A.J. 840, 842 (1978).

ing representation of it in this lawsuit. *Cf. City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F.Supp. at 196. While Benson obviously has not represented the plaintiff children for such a lengthy period of time, the Court takes judicial notice of the fact that he is recognized in this metropolitan area as a vigorous and effective advocate of civil rights. He has to date served as plaintiffs' counsel without remuneration; and, although plaintiffs might conceivably locate another attorney with a similar background and willingness to advance this cause *pro bono publico*, no prospective advocates have yet stepped forward "in the wings" even though the ongoing disqualification scenario has cast a dim light on Benson's current role throughout the past year (Ex. 86–87).

Since the clients' interest in retaining the services of challenged counsel is great, the public's interest in the most expeditious resolution of the poignant social issues in this desegregation suit is also significant, and the alleged conflicts of interest are more technical than real, the Court concludes that Canon 9 does not require the disqualification of challenged counsel. "Canon 9 . . . should not be used promiscuously as a convenient tool for disqualification when the facts simply do not fit within the rubric of other specific ethical and disciplinary rules." *International Elec. Corp. v. Flanzer*, 527 F.2d at 1295. The continuing representation of the plaintiffs and the KCMSD by those counsel will not "taint" this trial, but rather will serve to advance it toward a disposition on the merits. *See Board of Educ. of City of New York v. Nyquist*, 590 F.2d at 1246–47.

## VII. STATE ADVISORY COMMITTEE RULING

As the Court noted earlier in this memorandum, on August 6, 1979, the Advisory Committee of the Missouri Bar, through its chairman Harold W. Barrack, issued a brief two-page opinion-letter (Ex. 76), finding that neither Freilich nor Benson could represent the plaintiff school children without standing in a position of conflict with the KCMSD. The Committee's opinion was issued in response to an earlier request made by the district defendants. (Ex. 61).[10] Both in that opinion-letter and in earlier correspondence (Ex. 65), the Committee stated that its opinion "is certainly not binding on the Court and is not meant to infringe in any way on the jurisdiction of the Court." (Ex. 76, at 1; *see* Ex. 65, at 1). The district defendants have acknowledged the Committee's concession of its limited function, but they, nevertheless, insist that traditional principles of comity between federal and state governmental bodies dictate that this Court should follow the Committee's opinion. They have also predicted that a decision by this Court, departing from the Committee ruling, will undermine the force of future Committee rulings and will have an adverse effect by creating "a bad image and impression in the public mind."

The Committee's advisory opinion is entitled to and has received consideration by this Court in its painstaking analysis of the disqualification motions, since it is to some extent indicative of the ethical judgment of the Bar of the state in which this federal district court sits, the Bar of which challenged counsel are members. However, the conduct of those counsel in proceedings before this Court is, as previously noted, a matter for which this Court must and does assume responsibility, and over which it must and does exercise supervision. *Hull v. Celanese Corp.*, 513 F.2d at 571. "When an attorney appears before a federal court, he is acting as an officer of that court, and *it is that court which must judge his conduct.*" *Cord v. Smith*, 338 F.2d 516, 524 (9th Cir.

---

10. The Committee was first drawn into this action by Professor Freilich, who requested an advisory opinion on the propriety of his proposed representation of the plaintiffs against the State of Missouri, among other defendants, in view of his employment as a law professor by the UMKC Law School, an entity affiliated with the State of Missouri. (Ex. 58). The Committee found that Freilich's employment posed no obstacle to the proposed representation. (Ex. 60 & 65).

1964), *aff'd on rehearing,* 370 F.2d 418 (9th Cir. 1966) (emphasis added); *see* 28 U.S.C. § 1654 (1976) (In all courts of the United States the parties "may . . . conduct their own cases . . . by counsel as, by the rules of such courts, . . . [counsel] are permitted to manage and conduct causes therein."); *accord, International Business Machines Corp. v. Levin,* 579 F.2d at 279 n. 2; *Spanos v. Skouras Theatres Corp.,* 364 F.2d 161, 165 (2d Cir.) *cert. denied,* 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966); *Triplett v. Azordegan,* 421 F.Supp. 998, 1001 (N.D.Ill.1976); *Marketti v. Fitzsimmons,* 373 F.Supp. at 639 n. 1. *See also Sperry v. Florida ex rel. The Florida Bar,* 373 U.S. 379, 384–85, 83 S.Ct. 1322, 1325–1326, 10 L.Ed.2d 428, 432–33 (1963).

Therefore, although this Court, in the exercise of its supervision over attorneys conducting proceedings before it, has reached an ethical determination at variance with an advisory opinion of the ethics committee of a state bar, the Court is hard pressed to see how this result demeans or denigrates the function of that committee as an *advisory* body, or eviscerates the precedential value of the committee's opinions. Missouri courts recognize that the supervision of counsel's conduct before a trial court is a function committed to the trial court, *see State v. Bailey,* 278 S.W.2d 737, 741 (Mo. en banc 1955), while requests for censure of an attorney for unethical conduct are matters which should be submitted to the Advisory Committee or a local bar committee. *See D—L—L— v. M—O—L—,* 574 S.W.2d 481, 483 (Mo.App.1978). Such a view is not surprising since a trial court, observing firsthand the conduct of counsel in proceedings, is better equipped than is an advisory committee to undertake the "painstaking analysis of the facts and precise application of precedent" necessary to the delineation of "fine lines" marking the reaches of appropriate ethical conduct. *See United*

*States v. Standard Oil Co.,* 136 F.Supp. 345, 367 (S.D.N.Y.1955).

To recapitulate, because the Court's decision herein addresses the conduct of counsel in proceedings before a *federal* tribunal, it in no way interferes with the State of Missouri's traditional and historical role of regulating the practice of law in its courts. *See Dixon v. Georgia Indigent Legal Services, Inc.,* 388 F.Supp. 1156, 1162 (S.D.Ga.1974); *Staud v. Stewart,* 366 F.Supp. 1398, 1401 (E.D.Pa.1973). *See generally In re Primus,* 436 U.S. 412, 422, 98 S.Ct. 1893, 1899, 56 L.Ed.2d 417, 428 (1978); *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 460, 98 S.Ct. 1912, 1920, 56 L.Ed.2d 444, 456 (1978). And while the Court's decision is contrary to the Advisory Committee's opinion, the Court in no way signals any lack of respect for that body. In this connection, it is helpful to note that appellate courts, when called upon to review the decisions of lower tribunals, often determine that those decisions must be overruled, but no one has ever suggested that the functions and roles of those lower tribunals have thereby suffered "inestimable damage".[11] Such a suggestion could only evince a misunderstanding of the appellate process and our system of justice. Whether or not the district defendants labor under a similar misunderstanding, their arguments as to comity and the potential, prejudicial impact of this Court's decision are simply unfounded.

### VIII. CERTIFICATION UNDER § 1292(b)

In the recent decision of *In re Multi-Piece Rim Prod. Liability Litigation,* 612 F.2d 377 (8th Cir. 1980), the Eighth Circuit reversed its holdings in *Weber* and *Dean Foods, supra,* that an order denying disqualification of counsel is appealable as a "final order"

11. With respect to the district defendants' concern over public reaction to a decision by this Court which in effect "overrules" the Committee's opinion, it should be noted that newspaper articles reporting the Committee's opinion observed that "Harold W. Barrack, Advisory Committee chairman, emphasized that the final decision on whether Benson and Freilich could remain in the case rested with the court." *Attorney to Stay on Case,* Kansas City Star, Aug. 16, 1979 (Ex. 87); see also *Conflict of Interest,* Kansas City Star, Aug. 8, 1979 (Ex. 86).

under the "collateral order" doctrine enunciated in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The court announced that such orders will no longer be appealable as final orders under 28 U.S.C. § 1291. *See* 612 F.2d at 378; *accord Melamed v. ITT Continental Baking Co.*, 592 F.2d 290, 295 (6th Cir. 1979); *Community Broadcasting of Boston, Inc. v. F.C.C.*, 546 F.2d at 1026–27; *cf. In re Fine Paper Antitrust Litigation*, 617 F.2d 22, 26–27 (3rd Cir. 1980). Cognizant of the *Multi-Piece Rim* holding, the district defendants have requested certification, pursuant to 28 U.S.C. § 1292(b), of any order which this Court might issue denying the requested disqualifications.

 Section 1292(b) permits a party to appeal an interlocutory order which is not otherwise appealable if (1) the district judge entering that order believes that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from that order *may materially advance the ultimate termination of the litigation*", *id.* (emphasis added) and (2) the court of appeals in its discretion permits the appeal. *Id.* The Eighth Circuit's *Multi-Piece Rim* decision did not rule out the use of § 1292(b) certification as a procedural avenue for appeal of an order denying disqualification, but it did suggest that immediate review of such an order would be limited to "the exceptional case where irreparable harm could occur." 612 F.2d at 378. As the Court has noted throughout this memorandum, the disqualification questions in this case are unique. However, those questions are not being pressed by former clients who might stand to be injured by the denial of disqualification of an adversary's counsel; rather, those issues have been raised by other parties in this action—the district defendants—who have failed to demonstrate any appreciable harm that they will suffer by denial of the disqualification motions. *Cf. Melamed v. ITT Continental Baking Co.*, 592 F.2d at 293. Furthermore, proceedings on the disqualification motions have already sidetracked this litigation for a year, and certification

would only exacerbate that delay rather than "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Accordingly, the Court declines to certify the disqualification issues decided herein.

## IX. CONCLUSION

The Court has attempted herein to resolve "the acutely sensitive dilemma of protecting the confidentiality of the client-attorney relationship without needlessly interfering with a litigant's freedom to proceed with legal counsel of choice." *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F.Supp. at 195. And while the unique facts of this case have made that task somewhat difficult, the Court believes it is clear that the current advocacy roles of challenged counsel do not jeopardize the client confidentiality protected by Canon 4, or suffer from a less than independent judgment to which Canon 5 is addressed. Nor can it be contended that the average layman would perceive in those advocacy roles the improper appearance which Canon 9 seeks to prevent. This case is merely an illustration of Judge Irving R. Kaufman's observation that a "lawyer's ethical dilemmas will not be resolved by pat·answers or facile solutions." Kaufman, *Watergating on Main Street—Law*, SATURDAY REVIEW, Nov. 1, 1975, at 10, 18. The Court has not attempted to offer any "pat answers", but it believes that the results reached herein are obedient to the call of justice: "General rules of court, like general principles of law, are subject to exception when justice cries out for the exception." *Acorn Printing Co. v. Brown*, 385 S.W.2d at 819 [quoting *Jeude v. Sims*, 258 Mo. 26, 166 S.W. 1048, 1055].

In accordance with the foregoing memorandum, it is hereby

ORDERED that the motions of the district defendants to disqualify Arthur A. Benson II and the firm of Blackwell, Sanders, Matheny, Weary & Lombardi, and its co-counsel Robert E. Manley and Taylor Fields of the firm of North, Colbert & Fields, are denied; and it is further

ORDERED that the district defendants' request for certification of this order pursuant to 28 U.S.C. § 1292(b) is denied.