ACORN PRINTING COMPANY, a Corporation, Plaintiff-Respondent,

v.

Leonard BROWN and Benton Whitaker, d/b/a County Directory Service, Defendants and Third-Party Plaintiffs, Respondents,

v.

JOPLIN INVESTORS, INC., a Corporation, Third-Party Defendant and Defendant, Appellant.

No. 8317.

Springfield Court of Appeals.

Missouri.

Nov. 17, 1964.

Jack Fleischaker, Roberts & Fleischaker, Joplin, for appellant.

Rex Titus, Richart, Titus & Martin, Joplin, for respondents Leonard Brown and Benton Whitaker.

RUARK, Presiding Judge.

This is an appeal by Joplin Investors, Inc., from an order overruling what the appellant in its brief terms a motion to set aside a judgment for irregularity. The judgment against which the motion is directed was rendered on January 16, 1961, in what we will refer to as "the main case." In that case plaintiff, Acorn Printing Company of Tulsa, Oklahoma, had judgment against Joplin Investors, Inc., in the amount of $2,463.30.

We cannot here go into the facts and merits of the main case in order to determine whether or not ordinary judicial error was committed.[1] But for an understanding of the questions with which we are confronted, it is necessary to refer to the pleadings and relate some of the facts and circumstances which appear from the record in the main case in order to show the position of the parties, their conduct, knowledge, and knowledgeability, as such may may affect this case.

Joplin Investors was originally organized as a general business corporation with an authorized capital stock of thirty-thousand-dollars. Apparently this company was engaged in the business of publishing a county directory, which such venture was not financially successful and had resulted in a loss which the corporation (later) claimed in its income tax. At the onset of the matters with which we are here concerned, two men, Brown and Whitaker, appear to have been the sole remaining stockholders of the corporation. On or sometime prior to April 7, 1954, one Myron McIntosh, who described himself as being engaged "in the real estate business," approached Brown and Whitaker and the result was that on April 7, 1954, an agreement was reached whereby McIntosh became the owner of all the stock except ten (or possibly ten each) shares held by Brown and Whitaker. McIntosh was made chairman of the board, and thereafter he appears to have handled the financial affairs and to have written all the checks of the corporation. On April 30 the capitalization was increased to two-hundred-fifty-thousand dollars (McIntosh testified that he was interested in buying the corporation so that it might be operated for the purpose of making loans).

In the meantime, on April 10, 1954, an agreement was entered into between Joplin Investors as first party and Brown and Whitaker as second parties in reference to

1. Weatherford v. Spiritual Christian Union Church, Mo., 163 S.W.2d 916; Robb v. Casteel, Mo.App., 340 S.W.2d 180, 184; Casper v. Lee, 362 Mo. 927, 245 S.W.2d 132, 140; Murray v. United Zinc Smelting Corp., Mo., 263 S.W.2d 351, 354.

the publication of a new directory. This agreement recited in substance that the Joplin Investors was the owner of the copyright of "Rural Directory Service." It employed Brown and Whitaker to operate such service under an arrangement whereby the policy and management of said service was to be determined by three votes, one each by Brown and Whitaker and one by Joplin Investors. Brown and Whitaker agreed to make annual accountings and the profits of the corporation were to be divided one-third each. Joplin Investors was to deposit to the account of "Rural Directory Service" an initial two-thousand dollars for the purpose of buying materials and supplies, which deposit was to be accounted for by Brown and Whitaker. This agreement was signed on behalf of Joplin Investors by Myron A. McIntosh, chairman of the board, and Leonard R. Brown, as president. It was also signed by Brown and Whitaker as individuals. Thereafter, there were various financial transactions which involved checks and/or deposits by Joplin Investors to the Directory Service. Each of these checks was signed by McIntosh as chairman of the board. In one transaction Joplin Investors borrowed two-thousand dollars at the bank and put up as collateral accounts receivable of $3,226.00 of the Directory Service (consisting of contracts for advertising in the Directory Service). The major portion of this two-thousand-dollar note was later paid by receipts of payments on such contract advertising in the new directory. Acorn Printing Company of Tulsa agreed to print the new directory. On September 17, 1956, a check of Joplin Investors for five-hundred-dollars (signed by McIntosh) was issued to County Directory Service (apparently the name was changed), which check was thereafter endorsed by the Acorn Printing Company. On the same day, Brown and Whitaker gave their promissory note to Acorn Printing Company in the principal amount of $2,422.50, payable in installments of one-hundred-dollars per month. This note was actually prepared by McIntosh but was signed: "COUNTY DIRECTORY SERVICE by Leonard Brown, Benton Whitaker."

Thereafter, various checks were issued by Joplin Investors (signed by McIntosh) to the Directory Service. Some of these checks were endorsed by Acorn Printing Company, and there seems to be no question that they were for payments on the Acorn note. Finally default was made, and there followed an interlude of dispute as to whether or not Brown and Whitaker were liable on the notes personally or whether, as they contended, the note was signed by them as agents for Joplin Investors. Finally Acorn brought suit for the balance on the note against Brown and Whitaker. That is the main case with which we are involved.

The petition was signed by Max Patten as attorney for Acorn. Brown and Whitaker responded by answer filed by Attorney Titus charging that Joplin Investors was the owner of the Directory Service and the note was signed by them as agents of Joplin Investors, which agency was disclosed and known to plaintiff Acorn. Accompanying such answer was a third-party petition which charged that Joplin Investors was owner of the Directory Service; that Brown and Whitaker executed the note as agents for the corporation, which had received the benefits thereof; that Joplin Investors acknowledged the indebtedness and thereafter made payments totaling five hundred fifty dollars on such note. The petition prayed that if judgment be obtained against Brown and Whitaker they have judgment over in equal amount against Joplin Investors as the principal debtor.

Thereafter, on October 28, 1958, Joplin Investors filed its answer in which it denied agency; and also in effect asserted that the contract between Joplin Investors and Brown and Whitaker in reference to Rural Directory Service was ultra vires. This answer was signed by Max Patten, *who was also attorney for plaintiff Acorn.* On June 5, 1959, Mr. Patten, as attorney for plaintiff Acorn, filed amended petition in which he

alleged that Brown and Whitaker executed the note as individuals "and/or" acting as agents for Joplin Investors, and prayed for judgment against all three defendants. To that pleading Brown and Whitaker again responded with an answer, as before, that they had signed the note as agents of Joplin Investors, which was liable for the note. They also included a cross-petition against Joplin Investors praying for seven-hundred-dollars expense required in defending the action and, in event of judgment against them, for judgment over against Joplin Investors in equal amount. Joplin Investors filed separate answer denying agency and asserted that the employment agreement hereinabove referred to was void as to it because it was signed by defendants Brown and Whitaker while officers of the defendant Joplin Investors; the answer also asserted that the contract was ultra vires. This answer also was filed by Max Patten.

The case was tried to the Court. Early in the trial, the following colloquy was had:

"Mr. Patten: There are defendants Brown and Whitaker, and then there is another defendant, Joplin Investors, and we are fighting among ourselves here and not with the plaintiff in the case.

"The Court: In other words, Mr. Titus represents the defendants Brown and Whitaker and Mr. Patten represents the defendant Joplin Investors, Inc.

"Mr. Patten: That is right.

"The Court: And also the plaintiff Acorn Printing Company?

"Mr. Patten: But nobody has any controversy other than who is stuck."

Patten called a witness for plaintiff Acorn. Then defendants Brown and Whitaker were called and examined by their attorney Titus and cross-examined by Patten. Then McIntosh (who is principal owner of Joplin Investors) was called and examined fully in behalf of Joplin Investors by Patten and was cross-examined by Titus. It was the contention of Mr. McIntosh that Joplin Investors had no actual ownership of or interest in the Directory Service; that the moneys paid to or on behalf of the Directory were loans, and Brown and Whitaker were not authorized as agents of the corporation. On January 16, 1961, the court rendered judgment showing appearances of plaintiff Acorn by Patten, of defendants Brown and Whitaker by Titus, and of Joplin Investors (designated as third-party defendant) by Patten. The judgment was in favor of plaintiff Acorn and against Joplin Investors. Brown and Whitaker were discharged of liability.

Thereafter, plaintiff Acorn filed motion for new trial as to defendants Brown and Whitaker. The basis of the motion was that the evidence showed Brown and Whitaker had agreed to stand personally responsible on the note and *that they were not authorized to sign it for Joplin Investors.* This motion was signed by Patten. Joplin Investors filed a motion for new trial, the basis of which was (1) Brown and Whitaker had informed plaintiff Acorn that they would stand personally liable, (2) the corporation had no authority to engage in the type of business involved, (3) Brown and Whitaker knew they had no authority to execute the note for the corporation, (4) the business involved was ultra vires and beyond the corporate powers, (5) at the time of execution of the contract to operate the Directory Brown and Whitaker were officers of the corporation and contracted with themselves. *This motion was signed by Jack Burress as attorney for Joplin Investors.* This is his first appearance on the scene. Both motions were overruled. Subsequently Patten, representing Acorn, and Burress, representing Joplin Investors, appealed to this court. The appeals were not perfected and both were subsequently dismissed.

On December 3, 1963, Joplin Investors instituted the present proceeding by filing motion to set aside the judgment for irregularity and for error of fact. This time Joplin Investors is represented by the pres-

ent attorneys, Roberts and Fleischaker. The motion recites (1) that when the original judgment was rendered, both plaintiff Acorn and (designated as) third-party defendant Joplin Investors were represented by Max Patten in violation of Missouri Supreme Court Canons Rule 4.06, V.A.M.R., (2) the judgment was not in accordance with the pleadings, (3) the judgment was erroneous in matter of fact in that the same attorney represented plaintiff Acorn and Joplin Investors; that their interests were in conflict, and that such attorney did not make full disclosure of such conflict to movant Joplin Investors. The motion concludes with a prayer to stay execution and set aside the judgment for irregularities and error of fact. Attached to such motion are two affidavits by Myron A. McIntosh on behalf of Joplin Investors, one verifying the motion "to the best of his knowledge and belief," and the other reciting that at the time the suit was pending "neither I nor other members of the Board of Directors of Joplin Investors, Inc., were advised by Mr. Max Patten that his representation of Acorn Printing Company, the plaintiff in that lawsuit, and Joplin Investors, Inc., a third-party defendant in that lawsuit, *could result in a verdict in favor of plaintiff Acorn Printing Company and against the defendant Joplin Investors, Inc."*

No evidence was offered on the motion. At the conclusion of arguments the court made certain findings and rulings, those pertinent to our question being as follows:

"The issues in this case actually were tried between the defendants, that is, between Leonard Brown and Benton Whitaker against the Joplin Investors, Incorporated. The situation as to representation of the Acorn Printing Company and Joplin Investors, Incorporated, by Mr. Patten was discussed. I had full knowledge of it. It was agreed by all the parties involved that the note involved in the suit was owed to Acorn Printing Company by either Brown and Whitaker or Joplin Investors, Incorpo-

rated, or both, and my recollection is that the matter came up at a pre-trial conference, and my recollection further is that Mr. Myron McIntosh was present at the pre-trial conference. * * *

"I think there could be no question but what Mr. McIntosh was fully aware that a judgment could be entered against the Joplin Investors, Incorporated, and that he knew that Mr. Patten had originally brought the suit by Acorn Printing Company.

"The record or transcript actually should reflect that there was testimony that both Brown and Whitaker were officers of the corporation and that was part of the defense of the Joplin Investors that they should not have been permitted to make a contract between themselves and the corporation.

"Under all the circumstances I don't think the situation of this should have existed, but in this case there was just no question but what everybody understood what the situation was. For that reason I think these motions will be overruled."

No motion for new trial was filed.

The contentions made in appellant's brief, if strictly applied, are based upon irregularities patent on the face of the record (Rule 74.32, Section 511.250 RSMo 1949, V.A. M.S.) in that such record shows that Patten represented both plaintiff Acorn and ultimate defendant Joplin Investors, Inc., whose interests were adverse; and that such adverse representation was contrary to the established form and mode of procedure for the due administration of justice. Appellant asserts that the fact that McIntosh (Joplin Investors) *knew* of the dual representation and knew that a judgment could be rendered against it is not sufficient to heal the wound so made in the established mode of procedure. The inference from such contention is that where the record shows dual representation of adverse interests it should affirmatively show full disclosure and ex-

press consent; and if the record shows such dual representation without such further showing of full disclosure and consent, we must presume that there was none and set the judgment aside without further ado. Some of movant's arguments, especially that made before the court, also spill over into the realm of that which concerns motions in the nature of writ of error coram nobis—that is, relating to a fact not known to the court or the movant (and not discoverable by movant through the exercise of diligence) which, had it been known would have prevented entry of judgment.[2] The basis of this is that while the dual representation of adverse interests in this case is a matter of record, the matter of full disclosure and express consent required by Rule 4.06 involves the existence or non-existence of a fact.

Respondent's very thorough and extensive brief points out various reasons why we cannot in this case be concerned with the "error of fact" questions. It also asserts reasons why the ruling of the trial court cannot be set aside on the ground of irregularities patent, one of which is that the rules of conduct provided by the Canons of Ethics are not rules of civil procedure, and the motion based on irregularities patent is not the proper way to reach judgments in which misconduct of counsel is involved. We accord respondent's suggestions considerable respect and agree that some of them have merit; but this case involves the integrity of the adversary system through which the administration of justice is ac-complished and hence the integrity and effectiveness of our judicial processes. Because of this we are disposed, in this case, to disregard all matters of form, procedure, remedy, or so-called "technicalities" and decide this case (the motion to set aside) on the merits as we see them. We have not been cited to, nor have we found, any case which involved the factual situation we have here presented under a similar motion. Jedwabny v. Philadelphia Transp. Co., 390 Pa. 231, 135 A.2d 252, has some similarity. In that case the trial court sustained a motion for new trial on the ground of dual representation and was upheld by a divided court. There is also some similarity, as to the motion, in Patrick v. Bryan, 202 N.C. 62, 162 S.E. 207.

Each client is entitled to the undiluted and undivided loyalty of his lawyer. It is not just a pious platitude to say that a lawyer cannot, and may not attempt to, represent clients whose interests are conflicting and adverse, even though the motives of the lawyer may be honest and sincere.[3] However, some proceedings can be more adversary in form than fact (Overton v. Overton, 327 Mo. 530, 37 S.W.2d 565, 568); and it sometimes happens that the conflict of interest tends to be more technical than actual. In such a situation the representation of adverse interests can be only after a full and complete disclosure and with the express consent of all parties concerned.[4] We also apprehend that the interests can be so adverse and conflicting (or the possible collision or collusion between the interests can

---

2. For definitions and distinctions between motions for irregularity patent and motions in nature of writ of error coram nobis, see Edson v. Fahy, Mo., 330 S.W. 2d 854; Casper v. Lee, 362 Mo. 927, 245 S.W.2d 132; Chenoweth v. LaMaster, Mo. App., 342 S.W.2d 500; Murray v. United Zinc Smelting Corp., Mo., 263 S.W.2d 351; Wooten v. Friedberg, 355 Mo. 756, 198 S.W.2d 1; In re Jackson's Will, Mo.App., 291 S.W.2d 214; 28 Mo.L.Rev., pp. 286 et seq. (1963).

3. Gardine v. Cottey, 360 Mo. 681, 230 S.W.2d 731(12); Moffett Bros. Partnership Estate v. Moffett, 345 Mo. 741, 137 S.W.2d 507, 511; National Hollow Brake Beam Co. v. Bakewell, 224 Mo. 203, 123 S.W. 561, 567; Annot., 154 A.L.R. 501.

4. Canons of Ethics, Mo.Sup.Ct. Rule 4.06; Canons of Professional Ethics No. 6, American Bar Association; In re Buder, 358 Mo. 796, 217 S.W.2d 563, 574; In re Pfiffner's Guardianship, Mo.App., 194 S.W.2d 233, 236; In re Schield's Estate, Mo., 250 S.W.2d 151, 158; In re Conrad, 340 Mo. 582, 105 S.W.2d 1, 13. As to the test of inconsistency in employment, see Hoffman v. Hogan, 345 Mo. 903, 137 S.W.2d 441, 446.

be so against public policy) that there could not properly be any dual representation even *with* and after full and complete disclosure and consent. In such a situation the court has inherent power to, and should, intervene to prevent it.[5]

■■ How adverse and conflicting were the interests of Acorn (whom Patten represented as plaintiff) and Joplin Investors (whom Patten represented as one of the defendants)? Respondent argues that, since it had been agreed by all parties that Acorn was entitled to recover on its note from one or the other of the defendants, there was no conflict as to *its* (Acorn's) rights;[6] that there might be a recovery against Brown and Whitaker as agents *or* principals, or against Joplin Investors as principal, but not against both. As a general proposition of agency the contention in respect to recovery against one but not both is correct.[7]

But this general rule is subject to exceptions, some of which might involve intention, agreement, or conduct of the parties. There is also the possibility that Acorn *might* have raised the question that all three defendants were bound as parties to a joint venture or partnership. We do not decide this or pursue these suggestions further because we are not concerned with the merits of the main case. We do suggest that *if* Acorn had the right to recover against all three parties it was the duty of Patten to assert and contend for it. But if there was the duty (and the failure) to assert such, the injured party was Acorn, not Joplin Investors—and Acorn is not complaining. We do find that in the trial court some letters were introduced which were

at least thought to be beneficial to Acorn as against Brown and Whitaker but were probably not competent (on the question of agency) against Joplin Investors. Hence the position of Patten on introducing evidence favorable to one client and incompetent as to another placed him in an apparently conflicting position. However, it must be remembered that the case was being tried to the court (not a jury) after a full explanation of how the parties stood and what the real issue between the parties then was; and it should not have been difficult for the court to separate the evidence, admissible as to one and not as to the other, and so consider it.

Rightly or wrongly, insofar as Acorn was concerned, the case was tried on the admitted and agreed theory that Acorn was entitled to judgment on its note and the question was simply whether that judgment should be rendered against Brown and Whitaker *or* Joplin Investors. As to this McIntosh (for Joplin Investors) was placed on the stand and examined extensively. He was given full opportunity to and did introduce his (Joplin Investors') evidence and present his theory as to why Brown and Whitaker were liable and Joplin Investors was not liable.

Looking at the proceedings as a whole, we conclude that insofar as the trial of the main case was concerned the interests of plaintiff Acorn and defendant Joplin Investors were adverse, but on the theory upon which all parties tried the case the conflict was more technical than actual.

Even though the conflict was more technical than actual, there is still the question

5. 7 C.J.S. Attorney and Client, § 47, p. 827; 7 Am.Jur.2d, Attorneys at Law, p. 141; 14 Am.Jur., Courts, § 171, p. 370; Jedwabny v. Philadelphia Transp. Co., 390 Pa. 231, 135 A.2d 252, 254; Boyd v. Second Judicial District Court, 51 Nev. 264, 274 P. 7, 8; see State ex rel. Headrick v. Bailey, 365 Mo. 160, 278 S.W.2d 737(12); Logan v. Logan, 97 Ind.App. 209, 180 N.E. 32, 34.

6. In American-Canadian Oil & Drilling Corp. v. Aldridge & Stroud, Inc., 237

Ark. 407, 373 S.W.2d 148, 151, it was held that where the maker of the note admitted its validity, the attorney did not represent conflicting interests in acting for both holder and maker.

7. 3 C.J.S. Agency § 248, p. 175, § 215, p. 119; Grether v. Di Franco, Mo.App., 178 S.W.2d 469(5); Bovard v. Owen, Mo. App., 30 S.W.2d 154(7); Caruthersville Hardware Co. v. Pierce, Mo.App., 229 S.W. 238(2); Hunt v. Sanders, 313 Mo. 169, 281 S.W. 422(3).

of *full disclosure and consent*. We consider what disclosure was required in these circumstances: The law does not require the doing of a useless thing. It was not necessary to tell McIntosh what he obviously already knew. We cannot consider him as an infant, a moron, a distraught wife in a divorce case, or an uneducated person. He was a business man; the record indicates he was a man of affairs. If we consider his affidavit as evidence, we can accept the fact that Patten did not *tell* him that a judgment could be rendered against him, but we cannot swallow the implication that he did not *know* that such judgment could be rendered. He did not enter the case until after the third-party petition was filed. The petition prayed for judgment against his company. If he did not understand there was a possibility judgment could be rendered against his company, why seek an attorney? Further, the record discloses that he was present at the pre-trial conference and thereafter attended the trial. He heard the position of the parties explained in open court. Our conclusion is that he was fully familiar with the case and all its possibilities. Certainly he knew that a judgment could be rendered against his company when he employed Attorney Burress to file the motion for new trial; yet in that motion he did not complain that he was not so informed. We think the record justifies the conclusion that he was fully cognizant of the situation of the parties and what might result from this lawsuit.

▮▮ As to consent: It was the movant here (through McIntosh) who went to and employed plaintiff's counsel to (also) represent Joplin Investors after the notice conveyed by the third-party petition. McIntosh does not contend that he did not know Patten then represented Acorn. We think it is a fair inference that he employed counsel for the plaintiff hoping thereby to secure an advantage by having plaintiff's attorney so "trim his sails" in the conduct of his case in order to cast liability upon the other defendants Brown and Whitaker. We believe that it was a mistake for Patten to attempt to represent both Acorn and Joplin Investors under the circumstances shown here. We think it was poor judgment on his part but, proper or improper, the law and the Canons which condemn the representation of adverse interests is for the protection of the lambs, not the wolves; and the fact that the wolf has been caught in the lamb-fold is no reason why the lambs should be penalized. See dissenting opinions of Bell and Musmanno, JJ., in Jedwabny v. Philadelphia Transp. Co., supra, 390 Pa. 231, 135 A.2d 252. As stated by Judge Lamm in Jeude v. Sims, 258 Mo. 26, 166 S.W. 1048, loc. cit. 1055:

"* * * General rules of court, like general principles of law, are subject to exceptions when justice cries out for the exception. Court rules are mere ends to the attainment of justice, and are not to be twisted into instruments of injustice. Courts, about the exalted office of dispensing justice, are not to have their functions starved and atrophied by a mere phrase or rule, in an exceptional case calling for a suspension of the rule as a debt due to justice."

We do not propose to allow our Canons of Ethics to be used as tools by those who seek to pervert their purpose. It is our conclusion that the movant is in no position to claim that there was either lack of disclosure or consent and that the judgment of the Circuit Court should be affirmed. So ordered.

STONE and HOGAN, JJ., concur.