Russ B. ANDERSON, Trustee in Bankruptcy of Way-More Feeds, Inc., Plaintiff,

v.

John C. PRYOR, et al., Defendants and Third-Party Plaintiffs,

v.

JON T. CHEMICALS, INC., et al., Third-Party Defendants.

No. 79–0521–CV–W–7.

United States District Court, W. D. Missouri, W. D.

April 22, 1982.

Michael H. Berman of Berman, DeLeve, Kuchan & Chapman, Kansas City, Mo., for plaintiff.

Frank Barker III of Barker, Rubin & Sonnich and Benjamin F. Mann of Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for third-party plaintiffs.

Charles W. Rubin of Barker, Rubin & Sonnich, Kansas City, Mo., and Wm. Scott Power and John C. Riley of Pryor, Riley, Jones & Aspelmeier, Burlington, Iowa, for defendants.

Major W. Park, Jr. and Stephen B. Sutton of Gage & Tucker, Kansas City, Mo., for third-party defendants.

### ORDER DENYING THIRD-PARTY PLAINTIFF'S MOTION TO DISQUALIFY

JOHN R. GIBSON, Circuit Judge, Sitting by Designation.

The law firm of Pryor, Riley and Aspelmeier came before this Court as defendants in an action to set aside as a preference, payments made to it for services rendered to a Creditors Committee of the now bankrupt Way-More Feeds. That action has now been dismissed, but before it was, it gave rise to a third-party claim by the Pryor firm seeking indemnification from its former clients, five members of the Creditors Committee. The five creditors in turn brought a counterclaim against the Pryor firm for legal malpractice in not advising them of their exposure to liability as a result of their activities as a Creditors Committee and because of the failure of a contract drawn for the creditors to protect them from this liability.

Gage & Tucker, a Kansas City law firm, represented the five creditors in a number of lawsuits, related to the bankruptcy of Way-More Feeds, as well as in defense of the third-party claim and assertion of the counterclaim for legal malpractice. Gage was also retained by the Pryor firm to represent it in an earlier claim for preference against the Pryor firm filed in the District Court in Kansas City, Kansas. Pryor's motion to disqualify Gage as counsel for the five creditors is now before the Court and is denied.

Extensive stipulations have been filed. The facts in dispute were developed in an evidentiary hearing on the motion to disqualify.

Pryor's motion to disqualify the Gage office is based on Canons 4, 5 and 9 of the Code of Professional Responsibility. The most critical inquiry, however, is under Canon 4, which provides "a lawyer shall preserve the confidences and secrets of a client." The questions for consideration are whether confidences or secrets could have been imparted by Pryor to Gage, whether there is a presumption that they were, and whether the prophylactic rule of disqualification should apply. This involves detailed consideration of conferences between the Pryor and Gage firms in April and May 1977 and conversations and correspondence between the two firms in April and May 1978. There is conflict in the testimony of the attorneys involved and this must be considered in detail.

The issue faced by the Court is as expressed by Judge Kaufman in *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 227 (2d Cir. 1977):

It is a longstanding rule that, "[w]hen dealing with ethical principles, . . . we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and precise application of precedent."

## I. *The Hiring of Gage: 1977*

Gage & Tucker was first contacted by Gene Anderson of the Pryor firm on May 12, 1977. On that date, Anderson gave two members of the Gage firm, Kelly and Major Park, an overview of the problems relating to the five creditors. Two lawsuits had been filed against the creditors, others were anticipated, and litigation on behalf of the five creditors against others was contemplated.

Anderson and Park disagree on what was said at this first meeting. Anderson testified that he explained to Park the possibility of a preference claim against the Pryor firm to recover fees paid the Pryor firm by Way-More before the feed company declared bankruptcy. Anderson contends that he was aware in the first meeting of creditors of Way-More in January, 1977 that the Pryor firm might be the subject of the possible preference claim and to him it was a matter of critical concern that he discussed with Park. Anderson testified that he knew at that time of a claim the law firm might bring against the five creditors to enforce the creditors' promise to indemnify the law firm. He added that he did not believe the five creditors would dispute this obligation.

Scott Power of the Pryor firm also testified that in the early conversations with Park he was aware of the possibility of the preference claim against the Pryor firm, although it is apparent that most of the early conversations were conducted between Anderson and Park or Kelly of the Gage firm.

Park flatly denies that there was any discussion of the potential preference lawsuit on May 12, 1977. In discussing the series of conversations between representatives of the Pryor and Gage firms that followed the initial conference, Park is positive that there was no discussion of the possible preference lawsuit and no discussion of litigation against the creditors.

Neal Sinclair, an employee of Laverty, one of the five creditors, was present at the May 12 meeting. His testimony could help

resolve the contradiction, but the fact that he was not called to testify creates no inference in favor of or against either of the lawyers.

Anderson was positive that all information relevant to the creditors' litigation was given to Park. He and his partner, Scott Power, both stated that they knew that information given to Park could be related by Park to his clients, the five creditors. Anderson further amplified that some, but not all, of the information furnished to Park had been conveyed directly by him to the five creditors. Anderson was aware that anything he turned over to Park would be made known to the clients.

After the initial meeting of May 12, 1977, Anderson wrote a letter dated May 17, 1977, directed to representatives of the five creditors and stating:

> On May 12, 1977, Neal Sinclair, as representative of Chuck Laverty and myself, met with Mr. Scott Kelly and Major Park of that firm *to discuss their potential representation of the "Creditors Committee."* After considerable discussion with them with respect to the matter involved, *we felt it was appropriate to go ahead and engage their services on behalf of each of the companies to whom this letter has been written,* and the individuals named in the suits as representatives of the same companies, *subject,* however, *to your confirmation* to them of your desire for their representation. . . . Arrangements have been made for them to perform services on an hourly basis, and to *bill monthly,* dividing the total *cost of services equally among the five companies involved.* (Emphasis added.)

Power later sent Park a letter discussing the possibility of litigation by the creditors against the CPA firm which audited Way-More Feeds and others and attaching a memorandum, dictated by Anderson, concerning "the demise of Way-More Feeds and the role played by the so-called Creditors Committee therein."

Anderson was in touch with Park on a number of later occasions in 1977, primarily in the fall when a number of depositions were taken. The two lawyers met together in preparing several witnesses for these depositions.

### A. Creation of Attorney-Client Relationship

■ The testimony leaves no question but that Park and the Gage firm were hired as attorneys for the five creditors. The question of whether Park and Gage were also hired as attorneys for Anderson and the Pryor firm must be answered in the negative. In Missouri, the attorney-client relationship is an agency relationship governed by the same rules which apply to other agencies. *Southwestern Bell Telephone Co. v. Roussin,* 534 S.W.2d 273, 276 (Mo.App.St.L.1976), and *State v. Weinstein,* 411 S.W.2d 267, 272 (Mo.App.St.L.1967). Establishment of an agency relationship requires manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. *Groh v. Shelton,* 428 S.W.2d 911, 916 (Mo.App.Spfd. 1968). Here, Anderson's testimony points to the existence of such a relationship, but Park's testimony fails to establish consent on his part and that of his firm to represent Anderson and the Pryor firm at that time. Anderson's letter of May 17, 1977, to the five creditors conclusively establishes that Gage was hired to represent the five creditors. Its failure to inform the five creditors that Gage was also considered by Pryor to be its lawyer is the strongest admission that Pryor, at the time of writing the letter of May 17, 1977, did not so consider Gage. Anderson admits knowing at the time of writing the letter the possibility of the preference claim against him and the Pryor firm and that Pryor would call on the five creditors for indemnity. The failure to mention this possible conflict of interest and the statements concerning hiring Gage to represent the five creditors place Anderson and the Pryor firm in a position totally inconsistent with their claim that Gage was also asked to represent Anderson and the Pryor firm in the May 1977 meetings.

## B. *Confidentiality of Information*

■ There is no question but that the information turned over to the Gage firm by the Pryor firm was turned over for the full use and benefit of the five creditors who had been represented by the Pryor firm. The five creditors clearly were the Gage firm's clients after May 1977. Under these circumstances, the Pryor firm could not have expected that the information furnished the Gage firm would be withheld from the five creditors. Under similar circumstances a number of courts have held that there was no disclosure of confidential information that would justify disqualification of the attorney to whom the information was disclosed.

These issues were considered in some detail by Chief Judge Clark of this district in *Black v. State of Missouri, et al.,* 492 F.Supp. 848, 870–71 (1980), in which he concluded that when two or more parties are jointly represented "it is normally understood that any information which is shared by counsel by one party might and probably will be transmitted to the other party by counsel." Ordinarily, under Canon 4 a presumption arises that confidential information is imparted to the attorney. This presumption arises where there is a substantial relationship between the attorney's representation of the two successive clients. In our case, however, the substantial relationship test is not implicated and the presumption does not arise because the Pryor firm could not have expected that the information furnished to Gage would be confidential.

The leading case on this issue is *Allegaert v. Perot,* 565 F.2d 246, 250 (2d Cir. 1977), in which the court states:

> [B]efore the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he *could* have received information which his former client might reasonably have assumed the attorney would withhold from his present client....

> Because Walston necessarily knew that information given to Weil, Gotshal and Leva, Hawes would certainly be conveyed to their primary clients in view of the realignment agreement, the substantial relationship test is inapposite. Neither Walston nor anyone connected with it could have thought ... that any information given to the law firms conceivably would have been held confidential from the primary clients of the firms.

See also *Moritz v. Medical Protective Company, of Fort Wayne, Indiana,* 428 F.Supp. 865, 874–75 (W.D.Wisc.1977), in which the court states:

> In the circumstances present here, however, in which in the "first" case the attorney was the common attorney for A and B, there is something approaching a presumption that any information obtained by the attorney from either A or B might properly have been disclosed to the other.

See also *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 479 F.Supp. 465, 467–69 (E.D.La.1979); *Williamsburg Wax Museum v. Historic Figures,* 501 F.Supp. 326, 330 (D.C.1980).

We are here dealing with two experienced attorneys from the Pryor firm, who admittedly realized that the information that they passed on to the Gage firm must be disclosed to the clients, the five creditors. Under the circumstances their claim of the disclosure of confidential information cannot stand and their claim for disqualification under Canon 4 fails. Courts have considered that sophisticated clients, and specifically attorneys, have different understandings of such relationships than the ordinary client. See *Allegaert, supra,* and *City of Cleveland v. Cleveland Elec. Illuminating Company,* 440 F.Supp. 193, 201 (N.D. Ohio), *aff'd,* 573 F.2d 1310 (6th Cir. 1977), *cert. denied,* 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85.

There is a further reason for concluding that there was no disclosure of confidential information. When Anderson conferred with Park and Kelly on May 12, 1977, Neal Sinclair, a representative of Laverty, one of the five creditors, was present at the conversations. Had there been conversation between Anderson and Park about the po-

tential preference claim against the Pryor firm, as Anderson asserts and Park denies, Sinclair's presence would place him in the role of a stranger to the claimed Pryor-Gage attorney-client relationship and would destroy the confidential nature of the discussions. *State v. Fingers*, 564 S.W.2d 579, 582 (Mo.App.1978).

The Court concludes that there was no disclosure of confidential information by Pryor to Gage from May 1977 to April 27, 1978 that supports a claim by Pryor that Gage should be disqualified from representing the five creditors under Canon 4.

## II. *The Hiring of Gage: 1978*

Before the first preference claim was filed against the Pryor law firm in Kansas City, Kansas, Anderson, a corporate and tax specialist, had turned over the handling of the matter to Power, primarily a litigator with the Pryor firm. Power called Major Park on April 27, 1978 and informed him of the pendency of the claim against the Pryor firm and Anderson and that a pleading was due within two days. The question of a conflict of interest in Park representing the Pryor law firm and also representing the five creditors came up in these discussions and this was based on two issues: first, the issue of repayment of fees by the five creditors to the Pryor firm and, secondly, the creditors' interest in the trustee prevailing on his claim for the repayment of the legal fees paid to Pryor, which would enhance the recovery of the creditors.

Park wrote representatives of the five creditors and informed them of the preference claim against Anderson and of the request that Park defend the Pryor firm in that action. This letter of May 12, 1978 outlined the potential conflict of interest, proposed that Park defend the Pryor case under a reservation of rights of all parties, and requested written approval from the five creditors. Because of the short time involved, a telephone call was made to each of the five creditors to obtain their approval that Park act in this respect.

Power, on behalf of the Pryor firm, wrote to Park on June 2, 1978, discussing the question of conflict of interest. With re-

spect to Park's representation in the Pryor lawsuit, Power stated:

I believe this is the only logical way to proceed, since the expense involved in retaining another firm in this rather complex matter would be both needless and expensive, and from my vantage point it appears that you are doing an extraordinary job in protecting the interest of these creditors both in the bankruptcy and with regard to the series of claims filed against the Creditors' Committee as a result of the bankruptcy of Way-More.

Power agreed to be responsible for Gage's fees in the case against Anderson, but added:

I want to make it clear, however, that this commitment was made out of a desire to represent the best interest of the creditors' group you are now representing, and not because this firm is acceding to the position taken by Jon-T and Midwest [two members of the Creditors' Committee that asserted they had no obligation to pay the costs of the Pryor firm's defense].

Power further stated his understanding of the relationship:

This firm's position is that in reality you are not representing Gene Anderson personally, but rather the interests of the five creditors who are the ones who stand to lose if the Trustee is successful.

Power made clear that, if the trustee was successful in recovering from the Pryor firm the $15,000 in question, it would seek reimbursement from the five creditors and also reimbursement for any amount that it paid Gage with respect to the defense of the Anderson lawsuit. Power concluded:

Hence, looking at the problem from this point of view, I think it becomes obvious that *you are, in fact, continuing to represent the interests of the creditors and not of this firm per se.* (Emphasis added.)

Power stated that some additional information was imparted to the Gage firm at this time, particularly an itemized bill of the Pryor firm submitted to Laverty, one of

the five creditors, that outlined the work done by Anderson for the creditors group. Other information was conveyed to Park about what Anderson did in this respect but the record is not clear as to the scope of the information turned over to the Gage firm in April and May 1978.

Both Power and Anderson stated that no legal research materials were turned over to Gage by Pryor although there was some discussion of the legal issues involved.

Park's testimony described the potential conflict problem and he stated that very little new information was turned over to the Gage firm by Pryor during this time.

Park admitted he knew at the time that the five creditors had become dissatisfied with the legal services that they had received from Pryor. From his knowledge of the relationship between Pryor and the five creditors and legal research subsequently done, Park knew that at some point down the line consideration might have to be given to a legal malpractice action on behalf of the five creditors against the Pryor firm.

Both Power and Anderson testified that during this period their intention was that all information turned over to Gage would be used in defense of the five creditors and they had no knowledge that it would be used against them in a malpractice action.

When Park was hired to represent the Pryor firm in the action in Kansas, a Kansas lawyer, LaVone Dailey, had been representing the creditors in the bankruptcy action in the Kansas court. Miss Dailey also signed the pleadings filed in the Kansas action against Anderson, which was a motion to dismiss the complaint based on jurisdictional grounds. This motion was granted June 2, 1978.

### III. Gage's Position After April and May, 1978

Gage accepted representation of the Pryor firm and Anderson in May, 1978 while it was also representing the five creditors. Correspondence of the Pryor firm by its litigator, Power, contains strong admissions clarifying this relationship. Power's

letter of June 2, 1978 made clear that the Pryor firm considered that Gage was not representing Anderson personally or the firm per se but the five creditors. Viewing the evidence most favorable to Pryor, for Gage was counsel of record in litigation against the Pryor firm at the same time that it was counsel of record for the five creditors in other litigation, at the very least there was a dual representation by Gage of Pryor and the five creditors.

During this dual representation it is abundantly clear that the Pryor firm was aware of differing interests between it and the five creditors with respect to reimbursement. As attorneys, the Pryor firm would certainly be expected to know that if this difference continued, litigation might be necessary. With a direct conflict between the Pryor firm and the five creditors, Pryor cannot be heard to say that it gave information to the Gage firm which would be considered confidential.

We have already pointed to substantial authority that when information is given to attorneys under such circumstances there can be no claim of confidentiality. *Black v. State of Missouri, et al., supra; Allegaert v. Perot, supra; Moritz v. Medical Protective Company of Fort Wayne, Indiana, supra; Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., supra;* and *Williamsburg Wax Museum v. Historic Figures, supra.*

The testimony of Power as to what confidential information was turned over to Park during April and May of 1978 and the period of time that Gage actually represented the Pryor firm before the dismissal of the action on June 2, 1978 is vague. Power did turn over a statement of services rendered by Pryor to one of the five creditors, which would have itemized in detail Anderson's activities and, specifically, trips that he made to Kansas to interview witnesses. Whether this information would in any way bear upon the potential malpractice claim requires detailed analysis of the claims that have been asserted by the five creditors against Pryor.

The counterclaim of the five creditors against the Pryor firm alleges legal mal-

practice in essentially three respects: (1) failure to advise the five creditors that by executing a creditors' agreement they were incurring additional liabilities, in three alleged ways, (2) failure to advise the five creditors that they would increase their potential liability to other parties by hiring an individual to be present on the premises, and (3) failure to draft a creditors' agreement in such a fashion to protect the five creditors from potential liability.

■ The five creditors' claims for malpractice revolve around either the creditors' agreement itself, which admittedly was delivered by Pryor to the Gage office, or advice that would have been given by Anderson to one or more of the five creditors. Pryor cannot claim that either the creditors' agreement or their advice would be confidential as the five creditors would know what advice was given them and what agreement was entered into.

The substance of the conversations would be the subject of testimony by the creditors and their representatives and Anderson. The creditors' agreement document would speak for itself. There can be no claim of confidentiality with such evidence. Beyond this, the legal malpractice case against Pryor would involve expert legal testimony. The legal malpractice claim of the five creditors cannot be said to rely upon any claimed confidential or secret information imparted by Anderson or Power to the Gage firm, and it is most unlikely that any information imparted by Pryor to Gage would be material in the malpractice claim.

The representation of the five creditors in the assortment of litigation undoubtedly required use of the information obtained from the five creditors by Anderson during the September 1976 to January 1977 period of representation. It is also true that, after undertaking the representation of the five creditors, Gage would have in all likelihood interviewed all five of the creditors and their representatives and obtained substantially more information. If it is possible that any of the information obtained by the Gage firm would bear upon the malpractice action, there is a serious question as to whether this information came only from Anderson, Power, and the Pryor firm or came from other sources.

■ As was observed in *Moritz, supra,* when there is no presumption of a confidential relationship, and, in fact, there is a presumption that there was no confidential or secret information imparted, the burden falls upon the complaining party, here the Pryor firm, to demonstrate that there was some confidential or secret information imparted. The burden has not been met, and the evidence before the Court cannot establish this breach of confidentiality. Pryor alleges that the itemized statement which it sent to Gage to aid in its defense against the preference action may be used by Gage against it in the malpractice action. The itemized statement did no more than describe the services rendered by Anderson to the five creditors. A great deal of the work consisted of conferences and meetings, of which the five creditors would have been aware by receiving the statement. In view of the issues involved in the specific claims for legal malpractice that are pleaded, these interviews can have no bearing on the malpractice issue.

■ The Court must thus conclude that the information imparted by the Pryor firm to Gage could not be considered to be of a confidential nature because the Pryor firm and its responsible attorneys knew of the conflict of interest between the firm and the five creditors. The Pryor firm, having represented the five creditors, had an obligation to make available to Gage all information it possessed that would be of assistance in representing the five creditors.

The Pryor firm again faces its own admissions of the dual representation that it was responsible in creating. Gage's representation of both Pryor and the creditors is an obstacle to Pryor's claim of disclosure of confidential information that would create a breach under Canon 4. The Pryor firm, having created the relationship, must live with it.

### Canon 5 and Canon 9

Pryor also claims that Canon 5 and Canon 9 justify disqualification, although admittedly its Canon 5 argument is essentially based on the disclosure of confidential and privileged information which, as shown, cannot stand. Having carefully considered the testimony as well as the stipulations of the parties, in light of the requirements of Canon 5, Canon 5, standing alone, is not ground for disqualification.

■ Canon 9, the appearance of impropriety, is a bothersome issue, particularly in light of Park's testimony that he knew when hired by Pryor that his clients were dissatisfied with Pryor and at some time a malpractice action against Pryor might be asserted. At this point, Park and Gage should have declined the representation of Pryor. Nevertheless Pryor knew of a conflict of interest between the five creditors and the firm at that time, which was the subject of considerable discussion and correspondence. Pryor's claim is essentially that it did not comprehend the full dimension of the conflict. As attorneys, Pryor cannot claim that it should be protected simply because it did not fully appreciate the extent of the conflict when it knew that there was some conflict. The conflict was ultimately brought to fruition by the Pryor firm's third-party claims against the five creditors, its former clients, which led directly to the filing of the counterclaim by the five creditors against Pryor based on legal malpractice. The Court is convinced that under these particular circumstances in which Pryor created the appearance of impropriety, and as lawyers should have fully comprehended the potential for conflict and any resulting impropriety, Canon 9, standing alone, is too slender a reed to support disqualification. *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83 (5th Cir. 1976).

*Acorn Printing Company v. Brown*, 385 S.W.2d 812 (Mo.App.1964), presented a somewhat similar situation. Plaintiff was represented by a lawyer named Patton and filed suit against two individuals who brought in a third-party defendant having some contractual relationships with the individuals. MacIntosh, the Chairman of the Board of the third-party defendant, approached Patton and engaged him to represent third-party defendant. All parties agreed that the only dispute was between the defendant individuals and the third-party defendant and that there was no question but what plaintiff was entitled to recover from one or the other. After judgment was entered against the third-party defendant, the third-party defendant filed a motion to set aside the judgment for irregularity because of Patton's representation of both it and the plaintiff. The court ruled that Patton should not have attempted to represent both plaintiff and third-party defendant but refused to set aside the judgment. In our case the Pryor firm hired Gage knowing that Gage represented the five creditors, just as MacIntosh approached Patton knowing that it represented plaintiff in *Acorn*. *Acorn* stressed the full familiarity with the case possessed by MacIntosh and that he was fully aware of the situation that might result from the lawsuit. The same can be said for the Pryor firm.

Judge Ruark in *Acorn* observed that "the law and the Canons which condemn the representation of adverse interests is for the protection of the lambs, not the wolves." 385 S.W.2d at 819. In this case the only lambs that are visible are the five creditors, the clients at one time or another of both the Pryor firm and Gage. The interests of the five creditors must be given strongest consideration in determining whether Gage can represent them.

A number of decisions of the Eighth Circuit have pointed to the strong public interest in a client being represented by the attorney of its choice. *Central Milk Producers Co-Op v. Sentry Food Stores*, 573 F.2d 988, 991 (8th Cir. 1978); *Meat Price Investigators Ass'n v. Spencer Foods, Inc.*, 572 F.2d 163, 165 (8th Cir. 1978); both later overruled on the issue of appealability of orders denying motions to disqualify counsel.

900

■ This consideration should bear even more weight in this case, as the Pryor firm was the intermediary that arranged for retention of the Gage firm to represent the five creditors. To allow Pryor to later retain the Gage firm to defend it in the preference action and then seek to disqualify Gage from representing the five creditors in the third-party action that it brought against the five creditors flies in the face of this strong policy consideration. The five creditors, under the *Acorn* analysis, are the only lambs to be protected and should not be deprived of the counsel of their choice.

The Court is aware that the Eighth Circuit in *Coffelt v. Shell*, 577 F.2d 30, 32 (1978), has observed that in the disqualification situation any doubt is to be resolved in favor of disqualification.

However, having carefully considered all the circumstances surrounding the retention of Gage and its representation of both the five creditors and the Pryor firm for a limited period of time and the extensive analysis of somewhat similar situations in *Black, supra; Moritz, supra; Domed Stadium, supra*; and *Williamsburg Wax Museum, supra*, under Canons 5 and 9, as well as under Canon 4, the Court concludes that Gage should not be disqualified from representation of the five creditors.

The Court concludes that disqualification is not an appropriate remedy in this case for the following reasons:

1. Pryor initiated the hiring of Gage when it was well aware that Gage represented the five creditors;

2. Pryor considered that Gage was representing the five creditors while it was representing the Pryor firm;

3. The relationship precluded the disclosure of confidential information;

4. Consideration of the strong interests of the clients, the five creditors, in representation by lawyers of their choice; and

5. The Pryor firm, as lawyers, would have fully appreciated any potential for conflict when they retained Gage as attorneys in the preference case when they realized the conflict existing between Pryor and the five creditors.

Under these limited circumstances, and considering the strong interests of the common client in the investment in time of their counsel, Gage, disqualification of Gage would place an unfair burden on the five creditors, and cannot be said to be required for the protection of Pryor.

IV. *Further Considerations*

■ The five creditors, as the lambs, should not bear the cost of this expensive litigation on disqualification. Gage filed briefs totaling 38 pages. The hearing on disqualification consumed the better part of a day. The five creditors should not be required to bear this expense. The Court orders that Gage furnish to the Court an affidavit that no legal services concerning the disqualification issue have been billed to the five creditors, and if such services and expenses have been billed, reimbursement should be made and reported in the affidavit. Gage should also furnish affidavits filed by the five creditors that they either have not been billed for any of the expenses of the disqualification litigation or that any such expenses have been reimbursed.

■ Another consideration is that in conflict of interest situations there are remedies other than disqualification that may be utilized.[1] As was ruled in *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 383, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981), denials of motions for disqualifications may be subject to reconsideration. If a showing can be made at some future time that the confidential information was imparted to Gage by the Pryor firm and actually used by Gage in prosecution of the malpractice action, then the issue of disqualification can be reconsidered. Appropriate protective or-

1. *See generally, Developments in the Law ... Conflicts of Interest in the Legal Profession* (a nearly 260-page treatment of this sub-ject), 94 Harv.L.Rev. 1244, discussing the substantial body of law that has grown up in this particular area.

ders can be sought. Attorneys' fees can be disallowed. If in the discovery relating to the legal malpractice issue there appears that there has been some use by the Gage firm of any confidential information imparted by Pryor against it, further consideration of these alternative remedies may be considered. If it is shown that a trial is affected by confidential information, a judgment can be vacated and a new trial ordered if prejudice is shown. *See Firestone Tire & Rubber Co. v. Risjord, supra.*

It is therefore

ORDERED that the motion to disqualify is denied. It is further

ORDERED that the Gage firm shall file affidavits that its clients, the five creditors, have not been billed for any of the expense of this disqualification motion, and if the clients have been so billed and made payments, that any and all such payments have been reimbursed; the Gage office shall also provide affidavits of the five clients that they have made no payments or have been reimbursed for payments with respect to the conflict issue. It is further

ORDERED that discovery on all issues shall be concluded by June 25, 1982, and that all other Standard Pretrial Order No. 1 deadlines are extended accordingly.